[No. H014664. Sixth Dist. Oct. 15, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANCISCO VALDEZ, Defendant and Appellant.

**[Opinion certified for partial publication.‡‡]**

‡‡Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts IV, V and VI.

COUNSEL

Colleen M. Rohan, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald E. Niver and David H. Rose, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WUNDERLICH, J.—

### I. *Statement of the Case*

Defendant Francisco Valdez and 10 others were charged with first degree murder in the killing of Osvaldo Mojarro Rios and conspiracy to commit other enumerated offenses. He appeals from a judgment entered after a jury convicted him of the lesser offense of second degree murder and conspiracy and also found true gang enhancement allegations related to these offenses.[1] On appeal, he claims the court erroneously permitted a gang expert to relate

---

[1]Defendant was tried with two others: Joe Mamone and Joseph Aguilera, who were convicted of involuntary manslaughter and conspiracy. In *People* v. *Aguilera* (1996) 51 Cal.App.4th 1151 [59 Cal.Rptr.2d 587], we reversed Aguilera's convictions because

inadmissible hearsay to support his opinion on various subjects. In addition, he claims there is insufficient evidence to support the gang enhancement, the trial court erroneously permitted the prosecution to present witnesses solely to have them refuse to testify in front of the jury, and the court gave a defective instruction defining "reasonable doubt." We affirm the judgment.

## II. Factual Background

### A. Events on January 27, 1994

On January 27, 1994, around 2:30 p.m., a caravan of vehicles, including a white Datsun, drove by the residences of Jesus Mesa, Margarito (Mago) and Andres Reyes, and Antonio Gomez on Lotus Street in San Jose. Jesus Mesa heard Antonio yell "Sureño" at the caravan.[2] The vehicles returned and stopped. Several Hispanic males emerged and yelled "Norteño" back. At least one had a gun, and another had a knife. The one with the knife broke a house window and slashed the tires of a car. The group then ran back to their cars and drove off.

A short time later, the caravan went to the Washington Elementary School, circled for a while, and then stopped in front. The white Datsun pulled next to Osvaldo Rios's blue car. Members of the caravan got out of their vehicles. Some of them yelled "norte," "fourteen," and gang names, and a group of them ran toward people who had been standing around the school. Meanwhile, defendant got out of the Datsun. He had a gun, which he held at his waist in both hands. He then raised it to eye level, displaying it to others, who began to run.

According to Stephanie Navarette, who was in the passenger seat next to Rios, defendant said "what's up." Rios responded, "What? I don't even know you" and started rolling up his window. Navarette saw a gun and ducked. Defendant then fired several shots at Rios, hitting him in the head and arm. Navarette said defendant had a look of rage on his face. Members of the caravan quickly returned to their cars and sped away. Rios died at the hospital later that night.

statements were admitted into evidence in violation of the rule established in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] and were erroneously used against him at trial.

[2] Officer Michael Piscitello of the San Jose Police Department testified as an expert on criminal street gangs in San Jose and how they operate. He explained that Hispanic gangs fall into two categories: Norteño and Sureño. Norteño gangs identify with Northern California, the color red, and the number 14; Sureño gangs with Southern California or Mexico, the color blue, and the number 13. The two types of gangs are natural adversaries in constant conflict and express their mutual animosity via graffiti, provocative hand signs, challenges, confrontations, and physical violence.

## B. *Statements to Police*

Police arrested and interviewed numerous suspects and searched their homes. Steve Gonzales, Mario Abrego, Ramon Montes, Jesus Badillo, John Mendoza, Rafael Gudino, Marlon Mayorga, Mike Ramirez, Manuel Villalvazo, and Richards Villa gave statements to the police. Gonzales, Badillo, Ramirez, Gudino, Mayorga, Abrego, Villa, and Villalvazo indicated they were among a group of people that met at Roosevelt Park and formed a caravan. Montes admitted bringing the murder weapon with him that day. Villa said someone might have mentioned something about a gun while they were at Roosevelt Park. Abrego admitted driving the white Datsun. Mendoza rode in the Datsun.

Gonzales, Badillo, Montes, Abrego, Gudino, Mayorga, Ramirez, and Villalvazo indicated they were all out looking for Sureños to fight.[3] Gonzales referred to them as the "enemy." Badillo accused Sureños of "thrashing" people in the neighborhood. Mendoza was "fed up" with how Sureños treated him and others, noting he had previously been shot. Mayorga also said he had been chased and shot by Sureños. Villalvazo said there had been problems with Sureños.

Gonzales recounted how the caravan went to Lotus Street and stopped at a suspected Sureño house. Several people got out, chased Sureños, broke a window, and left for the west side of town to look for more Sureños. The group congratulated the person who broke the window. Mendoza, Gudino, and Mayorga also acknowledged their presence during the Lotus Street incident. Mendoza, Badillo, Montes, Abrego, and Villalvazo told about other encounters with Sureños on the way to the Washington Elementary School. When they arrived, they saw numerous Sureños and got out of their cars to chase them.[4] They returned to their cars and left after hearing gun shots.

Police officers testified about statements given by defendant and codefendants Aguilera and Mamone.[5] Defendant said he joined the caravan at Roosevelt Park, knew someone had brought a gun, and saw it in the white

---

[3]Badillo, Mayorga, and Gudino also said they were out looking for girls. Ramirez said they were out looking for "fun" and "trouble."

[4]Washington Elementary School has a reputation for being Sureño territory.

[5]The court repeatedly instructed the jury that it could consider these statements only as evidence against the person who gave them. Given the instruction, we need not summarize what codefendants Mamone and Aguilera said. However, during closing argument, defense counsel relied on Aguilera's statement to police that when the group drove by Washington Elementary School, one of them yelled, "San Jo, Norte or something like that." In response, Rios "flipped us off" and said, "fuck you, fuck Norte." Someone from the caravan then yelled, "Norte" or "puro San Jose, San Jo Norte." Rios responded, "fuck San Jose, fuck Norte" and started rolling up his window.

Datsun. He said the group confronted "wetback guys," "scraps"[6]—i.e., Sureños—around Lotus Street before going to the Washington Elementary School.

Defendant admitted shooting Rios but said it was accidental.[7] He explained that he got out of the car with the gun but did not personally load it and had no plans to shoot anyone. He did not talk to the victim but heard members of his group say something to him. He said the victim shrugged slightly. He saw the window of the victim's car rolling up, then aimed at the door of Rios's car, squinted or "blacked out," and then heard shots from the gun. He said he did not "mean to shoot him that many times." He knew he did not hit the female passenger because "I just made sure of it, I just aimed mostly for the door."

Defendant admitted being angry that day. He explained that in general "Sureños] all be fucking with my sister when they go to school and, shit, they jump on my home boys, they're always trying to disrespect . . . we ain't got to be doing anything, just walking down the street. They pulled guns, they shot at us before, they shot at me before, they tried to stab me." He also said Sureños had stabbed his brother in Colorado.

Defendant thought the victim was a Sureño because he had encountered the same car and a group of Sureños some days before. Defendant was angry at them because they had been "throwing all kinds of signs to us" and "laughing at us." He was irked because at the Washington School there were more Norteños and now the Sureños were "claiming nothing."

Defendant said he had associated with East Side Familia (ESF) but had disassociated from them in December 1992. He made it clear he did not want to implicate any of the others, and he later helped police find the murder weapon.

### C. *Evidence of Gang Membership*

Police searched the homes, jail cells, and vehicles of those interviewed and, except for that of codefendant Aguilera, found, among other things, gang-related graffiti such as the number "14," or "XIV," the word "Norteño" or "Norte," and the initials of various Norteño gangs. Some of these people also had Norteño tattoos.

In defendant's bedroom, police found a backpack, on which was inscribed "XIV," "Mr. ESSJ," "Eastside," and "Cisco." They also found undated

---

[6]"Scrappas" is a derogatory term some Norteños use to describe Sureños.

[7]When police first started interrogating defendant, he was "crying, his facial expression was distressed, his nose was running, [and] he was really upset."

papers with similar notations as well "ESF" and a card on a mirror containing "Norte" and "XIV." In a shed behind the house, police found graffiti like that on defendant's backpack.

### D. *Expert Testimony*

Officer Michael Piscitello testified as an expert on gangs in San Jose. (See fn. 2, *ante*, p. 499.) He traced the origin of today's Hispanic street gangs to prison gangs called the Mexican Mafia and the Nuestra Familia. As noted, gangs are divided into two rival groups: Norteños and Sureños. The two groups claim different colors and numbers and are in constant conflict for respect and turf. This often escalates from statements and handsigns to physical violence and killings.

Piscitello explained that several years ago there was only one Sureño gang and the rest of the San Jose gangs were Norteño. However, from 1989 on, the number of Sureño gangs increased. He opined that now there are 20 to 30 Norteño gangs and 10 to 15 Sureño gangs. As a result, conflict between them has escalated in certain neighborhoods. For example, the Washington Elementary School area was originally Norteño turf but over the years has been taken over by Sureños. Thus, he noted a "rash" of cases emanating from this area during the transition.

Piscitello further explained that historically Norteño gangs often fought with each other. In response to the Sureño killing of a Norteño woman, a large number of Norteño gang members met on Cinco de Mayo in 1993 and agreed not to fight each other and instead to focus their attention on Sureños and reclaiming the city for Norteños. As a result, a concept of uniting together to fight a common enemy was born. According to Piscitello, this was known as "San Jose or San Jo Familia, San Jose Family."[8] Piscitello noted he now gets few Norteño-versus-Norteño cases and most conflicts are between Norteños and Sureños.

Piscitello described various levels of involvement in street gangs. There are regular and part-time associates, hangers-on, and "wanna-be's"; bona fide members, who have been formally inducted—"jumped in"—by being beaten by members; and the "hard core" leaders of the gang. One can also be

---

[8]In support of his testimony, Piscitello explained that police learned about the proposed meeting through rumors. They planned to attend but received inaccurate information about the location. Through rumors and a confidential informant who attended the meeting, police learned that it had taken place at Hellyer Park. Piscitello also based his testimony on statements by those involved in this case that showed familiarity with the killing of the Norteño girl, the concept of Norteño unity, its name "San Jose Familia," and the meeting at Hellyer Park.

a member of one gang and an associate of another. Members can resign and walk away. However, some are reluctant because it involves getting "jumped out," a process that can be much worse than being "jumped in."

Piscitello outlined formal criteria used by the San Jose Police Department to determine whether a person is involved with a gang. A credible claim of gang membership by itself is accepted at face value without further corroboration. Otherwise, the existence of two or more of the following circumstances validates gang membership: having tattoos related to specific gangs; wearing clothes adorned with gang-specific logos; possession of gang-specific paraphernalia; being observed associating with known gang members on two or more occasions; being credibly identified as a gang member by third parties; and participating in a gang-related crime.

Turning to this case, Piscitello opined that the caravan of Norteños included members of seven different gangs: Capital Park Locos (CPL), ESF, Barrio Mas Locos (BML), Barrio North Side (BNS), West Side Mob (WSM), El Hoyo Palmas (EHP), and Vario San Jo (VSJ).[9] Piscitello explained how long each of these gangs had been in existence and then observed that each participant in the caravan was a member or associate of one of these gangs. Piscitello testified in detail concerning the bases of his opinion, which included: admissions by the participants; field identification cards, indicating gang association or involvement; items obtained in searches, such as letters, lists, magazines, and photographs; graffiti at their residences and on personal belongings and clothing; tattoos and nicknames; and statements to the police.

In particular, Piscitello opined that ESF was a "relatively new gang," two to three years old, with five to ten members, including defendant. He based this opinion on the items and observations made at defendant's residence; papers with Norteño inscriptions, nicknames, and Norteño gang initials written on them, including ESF; defendant's tattoos; defendant's admissions in 1992 and again in mid-1993 that he was a member of ESF; and evidence that "[o]n his pager the night of the homicide were the numbers 373, which he told the investigating officer stood for ESF."[10]

Finally, Officer Piscitello opined that on January 27, the caravan acted for the benefit of, in association with, or at the direction of all seven gangs of

---

[9]The parties stipulated that five of these gangs—CPL, BML, EHP, BNS, and BSJ (VSJ)—were "criminal street gangs" within the meaning of the gang enhancement allegations.

[10]During cross-examination, Piscitello said he was unaware that in some other proceeding a probation officer had testified that, as of 1994, defendant was not a member of a gang. He acknowledged that defense counsel told him about the probation officer's conclusion that ESF had been disbanded but disagreed with this conclusion.

which they were variously members or associates. To explain his opinion, Piscitello generally noted that members of seven different Norteño gangs, many of whom had had problems with Sureños, united together for a common purpose: to look for and fight Sureños. Moreover, each member was there to support and back up the others. Referring to his testimony about the "San Jose Familia," Piscitello said it helped show how and why the participants acted both for the benefit of their own gangs and for the benefit of each other's gangs. Piscitello then specifically explained why each member of the caravan acted for the benefit of a street gang.

As to defendant, Piscitello based his opinion on the extensive gang-related material discovered at his residence, his "heavy involvement" with ESF, statements about the problems he and his sister had had with Sureños, his participation along with others, and evidence that after the incident, defendant paged another participant, leaving the message, "270418-373-408-187," in which, as Piscitello explained, "373" referred to ESF and "408-187" referred to the San Jose Area and Penal Code section 187.

## E.  *The Defense*

Defendant presented no witnesses. Rather, counsel argued that defendant did not commit murder because there was no evidence of premeditation or malice. He argued that defendant shot Rios during a sudden quarrel or in the heat of passion and, at most, was guilty of voluntary manslaughter.

Counsel also argued that the gang enhancement allegation was not true because defendant was no longer a member of ESF, and if he was, there was no evidence ESF still existed or was a criminal street gang. Counsel ridiculed the expert testimony about some huge meeting of Norteños and pointed out there was no evidence that San Jose Familia or Norteños were gangs that directed the members of the caravan.

## III.  *Admission of Hearsay to Support Expert's Testimony*

As noted, the court allowed Officer Piscitello to relate at length and in detail, sometimes verbatim, an extensive amount of otherwise inadmissible hearsay from written reports, information learned from others on the street, letters, and statements by participants. The purpose was to reveal and explain the bases for Piscitello's opinions that (1) the participants in the caravan were members of or associated with gangs, and (2) they acted for the benefit of, in association with, or at the direction of a street gang.

Defendant contends that these two subjects were ultimate issues of fact for the jury to decide and that it was error to permit expert opinion on them. He

claims that Piscitello's testimony should have been limited to objective facts about street gangs from which the jury could make the required findings concerning gang membership and the purpose of the participants' conduct. He argues that Piscitello's subjective opinions were of no benefit to the jury and usurped its role because, in essence, Piscitello was rendering an opinion concerning defendant's guilt.

Defendant further contends that even if it was proper to allow Piscitello's opinions, it was error to allow him to relate such extensive amounts of otherwise inadmissible hearsay, in detail, under the guise of showing the bases for his expert opinion. Defendant claims the presentation of this otherwise inadmissible hearsay compels reversal because it prevented the jury from seriously considering the merits of his "heat of passion" defense. We find no error in the court's treatment of expert testimony.

### A. Subject of Expert Testimony

We first discuss whether defendant properly preserved his claim that it was error to permit expert testimony on specific gang affiliation and whether the individual participants acted for the benefit of a street gang.

The record reveals that before Piscitello testified, the court made various rulings on the scope of expert testimony. We find no specific objection to an opinion on gang membership or affiliation. Nor did counsel object that such testimony was unnecessary, inappropriate, or improper. Counsel did object to expert testimony about what each participant did during the January 27 incident on the ground that Piscitello lacked *personal* knowledge, and "*what* involvement they had" (i.e., the role each played) is "not the subject of proper gang expert testimony." However, this objection does not encompass the claim now raised on appeal.

Counsel also made a blanket objection "to [Piscitello] describing ultimate issues in the case[,]" claiming it would be improper to allow an opinion about whether he thought the defendants were "guilty" of the gang enhancement and then let him enumerate the reasons why. However, whether defendant, or any other participant, was a member or associate of a gang is not an ultimate issue of fact in a gang enhancement allegation: gang membership is not an element; nor does one need to be a gang member or associate to commit an act for the benefit of, in association with, or at the direction of a street gang.

Under the circumstances, defendant waived any assertion of error as to the propriety of allowing expert opinion concerning gang membership.

Moreover, had a proper objection been made, we would reject defendant's claim on its merits.

■ In *People* v. *Olguin* (1994) 31 Cal.App.4th 1355, 1371 [37 Cal.Rptr.2d 596], the court explained that "[t]he requirements for expert testimony are that it relate to a subject sufficiently beyond common experience as to assist the trier of fact and be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates. [Citations.] Such evidence is admissible even though it encompasses the ultimate issue in the case. [Citations.]" (See *People* v. *Torres* (1995) 33 Cal.App.4th 37, 45 [39 Cal.Rptr.2d 103]; *People* v. *Gamez* (1991) 235 Cal.App.3d 957, 965 [286 Cal.Rptr. 894].) On the other hand, "[e]xpert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness." (*People* v. *Torres, supra,* 33 Cal.App.4th at p. 45; see also *In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1121 [200 Cal.Rptr. 789] [expert opinion about who molested the child not admissible].)

"As a general rule, a trial court has wide discretion to admit or exclude expert testimony. [Citations.] An appellate court may not interfere with the exercise of that discretion unless it is clearly abused. [Citation.]" (*People* v. *Page* (1991) 2 Cal.App.4th 161, 187 [2 Cal.Rptr.2d 898].)

■ In general, where a gang enhancement is alleged, expert testimony concerning the culture, habits, and psychology of gangs is permissible because these subjects are "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801 subd. (a); *People* v. *Gardeley* (1996) 14 Cal.4th 605, 617 [59 Cal.Rptr.2d 356, 927 P.2d 713]; *People* v. *Olguin, supra,* 31 Cal.App.4th at p. 1370.)

■ In *People* v. *Gamez, supra,* 235 Cal.App.3d 957 (disapproved on other grounds in *People* v. *Gardeley, supra,* 14 Cal.4th at p. 624, fn. 10), the defendant acknowledged the propriety of testimony by a gang expert concerning territory, retaliation, graffiti, hand signals, and dress. However, he objected to, among other things, testimony that various individuals, including defendant, were members of particular gangs. (235 Cal.App.3d at p. 964.) The court concluded that the defendant's membership in a gang was a matter beyond the common knowledge of jurors and thus a proper subject of expert testimony. (*Id.* at p. 965; see also *People* v. *Champion* (1995) 9 Cal.4th 879 [39 Cal.Rptr.2d 547, 891 P.2d 93] [expert testimony that victims were members of a particular gang].) We agree.

Here, Officer Piscitello's testimony reveals that San Jose gangs are not public and open organizations or associations like the YMCA or State Bar

Association, which have a clearly defined and ascertainable membership. Rather, gangs are more secretive, loosely defined associations of people, whose involvement runs the gamut from "wannabes" to leaders. Moreover, determining whether someone is involved and the level of involvement is not a simple matter and requires the accumulation of a wide variety of evidence over time and its evaluation by those familiar with gang arcana in light of pertinent criteria.[11]

In permitting testimony concerning membership in various gangs, the trial court implicitly found that Piscitello's opinion would assist the jury in an area beyond common knowledge and experience and that the jury could not determine the participants' status as gang members or associates from the general expert testimony about gangs as easily or intelligently as Piscitello could. Under the circumstances, this finding was reasonable, and, therefore, we find no abuse of discretion.

We turn now to the propriety of expert opinion concerning whether defendant acted for the benefit etc. of a gang. This is an ultimate factual issue for the jury to decide. Thus, we shall assume that defendant's blanket, unspecific objection preserved his claim concerning the propriety of expert testimony on this issue.

"There is no hard and fast rule that the expert cannot be asked a question that coincides with the ultimate issue in the case." (*People* v. *Wilson* (1944) 25 Cal.2d 341, 349 [153 P.2d 720]; *People* v. *Brown* (1981) 116 Cal.App.3d 820, 827 [172 Cal.Rptr. 221].) " '[T]he true rule is that admissibility depends on the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved . . . . Oftentimes an opinion may be received on a simple ultimate issue, even when it is the sole one, as for example where the issue is the value of an article, or the sanity of a person; because it cannot be further simplified and cannot be fully tried without hearing opinions from those in better position to form them than the jury can be placed in.' " (25 Cal.2d at p. 349.)

For example, in *People* v. *Wilson, supra,* 25 Cal.2d 341, the prosecutor elicited an expert opinion concerning whether an abortion was spontaneous or induced *and* if induced whether it was performed for the purpose of preserving the life of the mother. On appeal, the court rejected the defendant's claim that the questions and answer improperly usurped the jury's function. (*Id.* at pp. 347-348.)

---

[11]Defendant claims it was particularly "egregious" to permit Piscitello to recite the police department's criteria for determining gang affiliation because it amounted to an opinion that these criteria are a reliable means of doing so. We find no error. The court properly permitted testimony concerning the criteria to explain the basis for Piscitello's opinion concerning gang affiliation. Challenging the reliability of these criteria and the manner in which they are applied are, and in fact were here, matters for cross-examination.

In *People* v. *Gardeley*, *supra*, 14 Cal.4th at page 619, the trial court properly allowed expert opinion concerning whether a particular incident was "gang-related activity" and whether the primary purpose of a particular gang was to commit specified offenses. (See also, e.g., *In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 998 [279 Cal.Rptr. 236].)

In *People* v. *Doss* (1992) 4 Cal.App.4th 1585 [6 Cal.Rptr.2d 590], the court rejected a similar claim, where the trial court permitted a pharmacist, qualified as an expert, to render an opinion on the ultimate issue of whether the defendant, also a pharmacist, possessed certain prescription drugs for the purpose of illegal sale on the street. (*Id.* at pp. 1595-1596; see *Paez* v. *Alcoholic Beverage Control Appeals Bd.* (1990) 222 Cal.App.3d 1025 [272 Cal.Rptr. 272] [opinion whether defendant was intoxicated].)

On the other hand, in *People* v. *Torres*, *supra*, 33 Cal.App.4th 37, the court explained that although there are some crimes a jury could not determine had occurred without the assistance of expert opinion as to an element, robbery and extortion were not among them. Therefore, it was error to permit expert testimony not only concerning the meaning of these terms but also whether these crimes had been committed because the jury was competent to determine whether the crimes had been committed and the expert testimony was "tantamount to expressing the opinion defendant was guilty of robbery and the first degree felony murder . . . ." (*Id.* at pp. 47-48.)

In this case, had all or most of the participants in the caravan been affiliated with the same Norteño gang, then perhaps expert testimony about rivalries, turf, respect, and forms of violence used by gangs might enable a jury to determine the "for the benefit etc." element as easily and intelligently as a gang expert could, thereby precluding the need for an expert opinion on that specific issue. However, the facts of the case were not so simple. The participants in the caravan were a diverse group, with affiliations to different gangs. They united for one day to attack Sureños. At the time it assembled, the caravan was not a "criminal street gang" within the meaning of the enhancement allegation. Moreover, their common identification as Norteños did not establish them as a street gang, for, as Officer Piscitello testified, Norteño and Sureño are not the names of gangs. Finally, without further evidence, the mere fact that a group of Norteños spent the day attacking Sureños does not prove conduct for the benefit of some unidentified street gang.

Under the circumstances, the questions of how such a diverse group, which, in Piscitello's opinion, represented seven different Norteño gangs, could have been acting for the benefit of a street gang and whether the

participants were doing so presented matters far beyond the common experience of the jury and justified expert testimony. Moreover, we find Piscitello's opinion here more like those permitted in *Wilson, Gardeley*, and *Doss* than the opinion erroneously allowed in *Torres*. Given the unique facts and Piscitello's expertise in evaluating the history, customs, and behavior of Hispanic gangs in general, and Norteño gangs in particular, we cannot say the trial court abused its discretion in finding that an expert opinion about whether the participants acted for the benefit of each and every gang represented by the caravan would be of assistance to the jury in evaluating the evidence and determining whether the prosecution had proved the enhancement allegation. Such an opinion was not tantamount to an opinion of guilt or, in this case, that the enhancement allegation was true, for there were other elements to the allegation that had to be proved.

## B. *Hearsay*

As noted, defendant claims the court erred in allowing Piscitello on direct examination to recite in detail a large amount of the hearsay used to formulate his various opinions. Defendant particularly complains that Piscitello was allowed to read verbatim and explain gang-related portions of letters written by or sent to participants Steve Gonzales, Marlon Mayorga, and Ramon Montes, relate the contents of statements by the participants, and talk about rumors and statements of an unidentified informant. Defendant claims the court violated the rule announced in *People* v. *Coleman* (1985) 38 Cal.3d 69, 93-94 [211 Cal.Rptr. 102, 695 P.2d 189]: " 'While an expert may state on direct examination the matters on which he relied in forming his opinion, *he may not testify as to the details of such matters if they are otherwise inadmissible.* [Citations.] The rule rests on the rationale that while an expert may give reasons on direct examination for his [or her] opinions, including the matters he [or she] considered in forming them, he [or she] may not under the guise of reasons bring before the jury incompetent hearsay evidence.' " (Italics added.) He also claims the testimony should have been excluded as more prejudicial than probative.

Recently, however, our Supreme Court in *People* v. *Gardeley, supra,* 14 Cal.4th 605, clarified the rules governing admission of hearsay by a gang expert to show the bases of an opinion.

In *Gardeley*, the trial court permitted a gang expert to relate during direct examination hearsay statements by the victim of an alleged gang attack as well as hearsay concerning other attacks by the same gang. Before doing so, however, the court admonished the jury that it could not consider the hearsay for the truth but only to show the basis of the expert's opinion. (14 Cal.4th

at pp. 612-613.) ■ In discussing the admission of hearsay, the Supreme Court explained that "Evidence Code section 801 limits expert opinion testimony to an opinion that is '[b]ased on matter . . . perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert] testimony relates . . . .' (*Id.*, subd. (b).) [¶] . . . [¶] Expert testimony may . . . be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions. [Citations.] Of course, any material that forms the basis of an expert's opinion testimony must be reliable. [Citation.] For 'the law does not accord to the expert's opinion the same degree of credence or integrity as it does the data underlying the opinion. Like a house built on sand, the expert's opinion is no better than the facts on which it is based.' [Citation.] [¶] So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily inadmissible can form the proper basis for an expert's opinion testimony. [Citations.] And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' *an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion.* [Citations.] [¶] A trial court, however, 'has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay.' [Citation.] A trial court also has discretion 'to weigh the probative value of inadmissible evidence relied upon by an expert witness . . . against the risk that the jury might improperly consider it as independent proof of the facts recited therein.' [Citation.] This is because a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact. [Citations.]" (*Id.* at pp. 617-619, italics added; original italics omitted.) With these principles in mind, the court concluded that the trial court properly ruled that the gang expert could recite the hearsay on which he had relied in forming his expert opinion.

■ Because an expert's need to consider extrajudicial matters and a jury's need for information sufficient to evaluate an expert opinion may conflict with an accused's interest in avoiding substantive use of unreliable hearsay, disputes in this area must generally be left to the trial court's sound judgment. (*People* v. *Montiel* (1993) 5 Cal.4th 877, 919 [21 Cal.Rptr.2d 705, 855 P.2d 1277].)

■ Under *Gardeley*, we find it well within the trial court's discretion to permit Piscitello to relate in detail the large amount of hearsay upon which

he relied. Given the number of participants and gangs represented in the caravan and the importance and complexity of expert testimony concerning whether criminal street gangs were involved in the killing and, if so, how such a diverse group could unite and act in support of each other's gang, we cannot conclude that the trial court abused its discretion.

We note that even in *Coleman*, the court recognized that most often hearsay problems will be cured by an instruction that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth. (*People* v. *Coleman*, *supra*, 38 Cal.3d at p. 92; accord, *People* v. *Montiel*, *supra*, 5 Cal.4th at p. 919.) In this case, the trial court repeatedly admonished the jurors in this way throughout Piscitello's testimony.[12]

Since an admonition may not always be sufficient, Evidence Code section 352 authorizes the court to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value. (*People* v. *Montiel*, *supra*, 5 Cal.4th at p. 919.) The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason. (*People* v. *Funes* (1994) 23 Cal.App.4th 1506, 1519 [28 Cal.Rptr.2d 758].)

We find no abuse of discretion here. The trial court could reasonably conclude that Piscitello's opinions were very relevant to prove the gang enhancement allegation and further that the hearsay upon which he based his opinions was highly probative on his credibility and the weight to be given his opinions. The court could also reasonably find that these factors outweighed any prejudice from the hearsay, especially the letters, because it did not directly name or implicate defendant in any other criminal activity and the court would (and repeatedly did) admonish the jurors not to consider it for the truth of matters stated.

Moreover, any alleged error in admitting too much hearsay was harmless. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Some hearsay would have been admitted, and the particular gang-related hearsay defendant complains about was not appreciably more inflammatory than his and his companions' conduct on January 27. Moreover, as noted, the hearsay did not directly name defendant or implicate him in other gang-related activities.

---

[12]Indeed, after the jury had been given the warning on three separate occasions and defense counsel requested it be given again, the court pointed out that the jurors were "nodding up and down yes, yes, yes. And I told them last time I wasn't going to tell them every time because the objections are preserved after that, because they're all nodding yes." Nevertheless, the court admonished the jurors at least three more times.

Furthermore, the jury obviously understood the court's instruction concerning the hearsay evidence (see fn. 12, *ante*, p. 511), and we may presume the jury followed it. (See *People* v. *Danielson* (1992) 3 Cal.4th 691, 722 [13 Cal.Rptr.2d 1, 838 P.2d 729].)

Finally, the evidence to support defendant's "heat of passion" defense was extremely weak and evidence of malice strong. Defendant took the gun with him from the car and provided no explanation for doing so. He did not hear Rios say anything to him or what the others were saying to him. There was little, if any, evidence of provocation and no evidence of quarrel. Defendant simply displayed the gun, aimed, and shot Rios as part of the general attack on Sureños that day. Under the circumstances, we reject defendant's claim that the gang hearsay prevented the jury from being able to consider the merits of his defense.

IV.-VI*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## VII. *Disposition*

The judgment is affirmed.

Elia, Acting P. J., and Mihara, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 3, 1998.

---

*See footnote, *ante*, page 494.