Filed 8/8/13  P. v. Renteria CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B242235 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA080444) |
| v. | |
| RICARDO CHAVEZ RENTERIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge.  Affirmed.

Weilbacher & Weilbacher, William Weilbacher Jr. for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Supervising Deputy Attorney General, Stephanie C. Santoro, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted defendant and appellant Ricardo Renteria guilty of corporal injury to a spouse/cohabitant/child's parent (Pen. Code, § 273.5, subd. (a)[1]), assault with a deadly weapon (§ 245, subd. (a)(1)), and four counts of contempt of court (§ 166, subd. (c)(1)). The jury found true the allegations that defendant personally used a deadly and dangerous weapon in the commission of the corporal injury offense (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury in the commission of the corporal injury and assault offenses (§ 12022.7, subd. (e)). The trial court sentenced defendant to eight years in state prison. On appeal, defendant contends that the trial court erred in admitting expert witness testimony on battered woman's syndrome because it was irrelevant and more prejudicial than probative, such testimony left the jury with the impression that the victim was unavailable at trial due to defendant's conduct, and the testimony improperly told the jury that domestic violence victims are truthful. We affirm.

## BACKGROUND

The prosecutor called Melissa Renteria,[2] the complaining witness in this case. The trial court informed the jury that Melissa was not available to testify during the trial and that her lack of availability was not due to any conduct by defendant. Because Melissa was unavailable, her preliminary hearing testimony, which she gave some five months before trial, was read to the jury.

Melissa testified at the preliminary hearing that she and defendant had been in a relationship for 14 years, had been married for one year, and had six children. On January 9, 2011, Melissa and defendant were at home on Burl Avenue, in Lennox, Los Angeles County. About 9:17 p.m., Melissa got into an argument with defendant.

---

[1]     All statutory citations are to the Penal Code unless otherwise noted.

[2]     Because Melissa Renteria and defendant share the same last name, we will refer to Melissa by her first name.

Melissa could not remember what the argument was about, but remembered that defendant was talking to an ex-girlfriend on the phone. Defendant asked Melissa to leave. Melissa agreed, but changed her mind, suggesting that she and defendant just ignore each other and talk later when they were no longer angry. Melissa began ironing her son's clothes. She drank a tall can of beer and took two sleeping pills. She wanted to go to sleep immediately so as to avoid arguing with defendant or hearing him on the phone.

Defendant asked Melissa what she was doing "there." She responded that she was staying. Defendant said that he had asked her to leave and that she was trespassing. Defendant took Melissa's iPod and cell phone. Melissa asked defendant to return her cell phone and reached for it. She started to stand and defendant began hitting her. Defendant hit Melissa in the eye and she fell. He grabbed Melissa's hair and dragged her "from one side of the wall to the other." Defendant then picked up Melissa and slammed her down to the floor. Melissa's forehead hit the floor. As she tried to get up, defendant picked up a hammer. Defendant held Melissa by her hair and struck her head with the hammer, rendering her unconscious.

When Melissa regained consciousness, she was lying on the floor and saw blood. Defendant was sitting on the bed talking on the phone. Melissa wanted to leave and tried to grab her phone and a pair of her daughter's boots to wear. Defendant told Melissa that she could not take the boots. Defendant then got on top of Melissa and started strangling her. Melissa asked defendant to stop, telling him that he was hurting her and that she could not breathe. She tried to fight off defendant, biting his arm, but she passed out.

Melissa woke up and determined that she had urinated on herself. She changed her clothes so she could leave. Defendant's mother came over and asked Melissa what was happening.[3] Melissa said she wanted to leave. Defendant said that Melissa could not leave; he wanted her mother to pick her up. Melissa called Lara who picked up Melissa and took Melissa to her house. Lara called the police.

---

[3] According to Melissa's sister, Elizabeth Lara, Melissa and defendant's home was a manmade shack on the property where defendant's parents lived.

Melissa denied that she told any of the officers who interviewed her that she had engaged in a "tussle" with defendant and gave up when she got tired. She testified that throughout her relationship with defendant there had "always been abuse." Melissa testified, "I was just tired of it. So I was just—if he's going to do something, he's going to do something. Let him get it over with and me go to sleep."

Los Angeles County Sheriff's Department deputies went to Melissa and defendant's home. There, deputies found a hammer, a receipt with blood on it next to the hammer, and blood stains on the floor. Defendant was arrested.

Melissa had a black eye from defendant hitting her and received medical treatment for a head injury. An emergency room doctor testified that she used three staples to close a two-centimeter laceration on Melissa's head. She also testified that Melissa had a "fresh" injury to her eye and tenderness in her lower neck. According to Lara, when Melissa was discharged from the hospital, she returned to Lara's house. Melissa later left Lara's house and lived in two shelters and then with various friends.

While defendant was in jail, the jailers recorded phone calls between defendant and his mother and defendant and Melissa. In a phone call with his mother, defendant said, in apparent reference to Melissa, that "she should just say that—that she did it to herself in an accident."

In one conversation, defendant and Melissa said:

"[Defendant]: Just, you remember yesterday what I said, right?

"[Melissa]: Yes.

"[Defendant]: About—about—that being an accident like [unintelligible].

"[Melissa]: Yeah."

In a second conversation, defendant told Melissa that if she did not "speak up," "they" were going to keep defendant in jail for five or six months, until "everything" "settled down." Melissa responded that she had written a letter but was thinking about writing a better letter with "bigger and fancier words." Defendant said, "Yeah, well, whatever, but, you have to—the point is that you have to say that you don't want that anymore that the D.A. that—he's putting it on you and you don't—you know? All that

4

you know it is a misunderstanding. . . . Because otherwise, I'm just going to stay in here and then the—the longer I stay in here then I'm gonna have say, you know what? You're gonna have to go to your mom's or—or somewhere else and I—I don't wanna do that but—you know?"

In May 2011, Melissa received several messages from defendant via Facebook. On June 1, 2011, Melissa met with the prosecutor in the case. The prosecutor informed her that there was a protective order in the case. Thereafter, Melissa called defendant because she had considered "working things out with him." From June 2, 2011, to the July 7, 2011, preliminary hearing, Melissa and defendant had "basically been together on and off." Melissa slept at defendant's house. They were seeing each other, talking, and having sex.

Gail Pincus, Executive Director of the Domestic Abuse Center in Van Nuys, testified as an expert witness on domestic violence. Pincus explained that her testimony began with the premise that the case involved an abusive relationship, but under the code section that allowed her to testify, she could not offer an opinion about whether Melissa and defendant were in an abusive relationship. She was testifying only to educate the jury about how battered women typically think, feel, and behave. Pincus stated that she had "absolutely no knowledge of this case." She testified that she did not know the defendant or victim in this case—she did not even know the victim's name. She had never met or interviewed Melissa and had never spoken to defendant. Pincus had not made a determination that Melissa had been in an abusive relationship.

According to Pincus, an early study on domestic violence showed a "cycle of violence" that has three phases. At the beginning of the relationship, the abuser is charming, romantic, intense, sort of rigid, and then a rule setter. In the first phase, there is a long period of rising tension in the relationship. In the second phase, there is actual physical violence. In the third phase, there is a honeymoon period. The victims persevere through the rising tension and actual physical violence to return to the honeymoon period in which the abuser is charming and romantic and there is no tension. Victims of such abuse may self-medicate with alcohol or drugs as an avoidance strategy.

5

Another study found that the core of an abuser's personality is the need for absolute power and control over the victim and any children.  The abuse begins with criticism such as the victim is overly emotional or is fat or stupid.  The abuser also isolates his victim from her family, friends, church, or other aspects of her life that make her a part of a community and provide her with a support system.  He also engages in economic control or abuse to make his victim economically dependent on him so she feels as though she cannot escape.  He will minimize, deny, or blame the abuse on his victim, and will attempt to destroy the victim's self-esteem.

The abuser engages in such conduct because of "male privilege," meaning that the abuser's sense of masculinity is based on how much power and control he has over his female victim.  When such a man believes that his victim has acted in a way that has dishonored, disobeyed, disrespected, humiliated, or embarrassed him, he no longer thinks of her as the woman he loves, but as a hated object.  At some point, when the victim breaks one of the abuser's rules, the abuser "crosses through this mythical membrane that we all have that separates out violent thoughts from violent actions and literally gives himself permission to cross over into the physical violence."  Once the abuser works through the "adrenaline" from the victim's perceived slight, he has regained his manhood—his power and control over the victim.

Abusers are afraid of going to jail, that their victims will leave, or that others will learn of their abuse.  If the abuser believes one of these consequences will happen to him, he will flip into the honeymoon phase, begging, crying, and promising that the abuse will never happen again.  If the victim calls the police and the abuser is jailed, the abuser becomes desperate and obsessed with the victim who, the abuser believes, holds the key to his jail cell.  The abuser begins a "campaign" to pressure the victim to say that she lied.

Around the abuser's behavior, the victim "does a dance of accommodation" that previously was referred to as "battered women syndrome" but now is referred to as "intimate partner battering and its effects."  In the face of the abuser's criticism, the victim wonders how she has changed from the person to whom the abuser was so charming and nice, and tries to figure how what she can do to remedy the situation.  The

6

victim minimizes and blames herself for the abuse. Eventually, the victim will leave—victims leave an average of five to seven times before they leave for good—but the victim will return when the abuser promises never to do it again.

When the victim returns, she becomes "hypervigilant, walking on eggshells, and develops a sense of helplessness, hopelessness." The victim becomes numb to the first level of violence and emotional abuse and control. If there is an incident that the victim perceives as life threatening to herself or someone she loves, a "trauma window" opens that clears out the victim's numbness and she is "very clear." The victim can recall the details of what has just happened to her and the history of violence and she is willing to do something different.

It is during this window that the victim might call 911 or a battered women's shelter or go to the hospital emergency room. "At that moment, that victim is going to spontaneously spit out what happened to them out of the fear of what has just happened to them. They have enormous need to tell people what just happened to them. They don't edit it. They may jump around a lot from past history to current, whatever, but they just—they have this need to sort of tell the story." Depending on the skill of the interviewer, the victim can give a "very, very detailed account" of her recent and past abuse.

The trauma window is very fragile and remains open only as long as the victim feels safe. Contact by the abuser or his family, financial pressure, or her children's calls for their father may cause the window to close. The victim then minimizes and blames herself for her abuser's conduct and regrets reporting him. She returns to the abuser, starting the cycle of abuse over again. She will do what the abuser tells her to do to interfere with the court process, such as recant her story or disappear. It is common for the trauma window to close before the victim has a chance to testify.

For some victims, those who cannot endure the abuse any longer, the trauma window remains open despite outside pressures. These victims go to shelters, get counseling, and pull away from the abusive relationship. They cooperate with prosecutors and obtain restraining orders.

In recent years, among the injuries that occur in domestic violence cases, strangulation has received significant attention. Strangulation is difficult to document as there are no outward signs about 60 percent of the time. Signs of strangulation include coughing, difficulty swallowing, a sore throat, red marks on the face and neck, urinating or defecating, and vomiting.

Defendant testified in his own behalf. He testified that he and Melissa were not married when the incident in this case took place. They got married one month later. Melissa had approached defendant shortly after the incident and informed him that she was pregnant with his child.

On the date of the incident, defendant and Melissa lived at his mother's house in an attachment to the garage. About 9:00 p.m. that day, defendant and Melissa were sitting on their bed. Defendant was playing solitaire on his cell phone. Melissa was listening to an iPod. They began to argue when defendant received a text from his ex-girlfriend.

Melissa cursed at defendant and grabbed a hammer. She approached defendant rapidly with the hammer raised. Defendant thought Melissa was going to hit him with the hammer, so he got up quickly and grabbed her arm or wrist causing the hammer to nick the back of her head. Melissa bit defendant's arm, and he grabbed her face and pushed her away. Melissa then bit his other arm. Melissa grabbed the hammer, fell to the ground, and wrestled with defendant for the hammer. Defendant took the hammer from Melissa and threw it on the bed.

Melissa touched the back of her head and started screaming that defendant had hit her with the hammer. Defendant denied that he hit her and asked to see the back of her head. Melissa took a receipt from her pocket and placed it on the back of her head. Defendant took off his shirt and gave it to Melissa so she could put it on her head. Defendant denied slamming Melissa to the floor, pulling her hair, dragging her across the floor, or punching her in the face. According to defendant, Melissa had bruising on her right eye when she returned from the liquor store prior to the incident.

8

When defendant was talking to his mother on the recorded conversation that was played for the jury, he was referring to an incident between his sister and her boyfriend when he said, "Yes, she should just say that, that she did it to herself in an accident." The statement was not about Melissa.

On March 9, 2011, defendant was given a copy of a protective order. Melissa was named on the order as a "protected person." The order stated that he was to have no personal, electronic, telephonic, or written contact with Melissa. The protective order had an exception for contact with Melissa for the safe exchange of their children for visitation pursuant to any later issued family, juvenile, or probate court order. Such a later order was never issued. Defendant testified that his attorney told him that he could contact Melisa if it related to the well-being of his children. Between May and July 2011, Melissa called defendant more than 43 times. Defendant had contact with Melissa at least twice in May, almost every day in June, and in July. Defendant admitted that he was guilty of the charged contempt counts.

## DISCUSSION

### I. Pincus's Testimony

Defendant appears to contend that the trial court erred in admitting Pincus's testimony because it was irrelevant and more prejudicial than probative under Evidence Code section 352 (section 352). The trial court did not err, and any error was harmless.

### A. *Background*

Prior to trial, the prosecutor stated that he intended to present Pincus's testimony to explain why Melissa would reunite with defendant, arguing that a jury would not understand how a victim could reunite with her abuser after such a vicious attack. He argued that Pincus's testimony also was relevant to the contempt counts for violating a protective order. Defense counsel stated that she had no objection to Pincus's testimony if Melissa first testified, but that without Melissa's testimony, Pincus's testimony would allow the jury to speculate as to what happened and why it happened. She also objected

9

that the testimony would be more prejudicial than probative under section 352. The trial court ruled that the probative value of Pincus's testimony significantly outweighed its prejudicial effect.

### B. Standard of Review and Application of Relevant Principles

We review the admission of expert witness testimony under Evidence Code sections 801 (section 801) and 1107 (section 1107) for an abuse of discretion. (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 902.) Likewise, we review for an abuse of discretion a trial court's decision to admit evidence over a defendant's section 352 objection. (*People v. Jablonski* (2006) 37 Cal.4th 774, 824.) A trial court abuses its discretion when it rules in a manner that is arbitrary, capricious, or patently absurd and results in a manifest miscarriage of justice. (*People v. Shaw* (1998) 64 Cal.App.4th 492, 496.)

Section 801, subdivision (a) permits expert testimony on subjects "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." Section 1107, subdivision (a) provides, "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." Section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Expert witness testimony on domestic abuse "cannot be admitted to prove the occurrence of the charged crimes." (*People v. Brown* (2004) 33 Cal.4th 892, 908.) It may be admitted, however, to explain the behavior of the victims of such abuse. (*Ibid.*) In *People v. Kovacich, supra,* 201 Cal.App.4th 863, the defendant was found guilty of the first degree murder of his wife. (*Id.* at p. 868.) Evidence was presented that the

10

defendant had verbally and physically abused his wife over a period of years. (*Id.* at pp. 869-871.) An expert testified about the cycle of violence in domestic abuse cases and the coping strategies or mechanisms that victims develop to stay in their relationships including denying, minimizing, or rationalizing the abuse. (*Id.* at pp. 900-901.) The court held that the trial court did not abuse its discretion in admitting the expert's testimony because the victim's credibility was in issue even though her death precluded her from testifying. (*Id.* at p. 902.) The trial court held that the testimony was necessary to disabuse the jurors of commonly held misconceptions about domestic violence victims and to explain the psychological reasons for a victim's seemingly self-impeaching behavior such as staying with or returning to her abuser. (*Ibid.*)

The trial court did not abuse its discretion in admitting Pincus's testimony because it was relevant to Melissa's credibility and admissible under sections 801 and 1107. That is, the testimony explained Melissa's seemingly self-impeaching behavior in resuming her relationship with defendant after he beat her and struck her with a hammer, a matter not within a juror's common experience. (*People v. Kovacich, supra,* 201 Cal.App.4th at p. 902; §§ 801, subd. (a), 1107, subd. (a).)

The trial court also did not abuse its discretion in admitting the evidence over defendant's section 352 objection. The probative value of Pincus's testimony was high because it explained intimate partner battery and its effects and helped the jury understand why Melissa might resume her relationship with defendant despite his abuse. There was little potential for prejudice as Pincus made clear that she was testifying only to educate the jury about how battered women typically think, feel, and behave. Pincus testified that she had not interviewed Melissa or defendant, had "absolutely no knowledge of this case," and had not made a determination that Melissa had been in an abusive relationship. (*People v. Jablonski, supra,* 37 Cal.4th at p. 824.)

### C. *Prejudice*

Even if the trial court erred in admitting Pincus's testimony, any error was harmless. "The erroneous admission of expert testimony only warrants reversal if 'it is

11

reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*); see also *People v. Venegas* (1998) 18 Cal.4th 47, 93 [74 Cal.Rptr.2d 262, 954 P.2d 525] [applying *Watson* standard to the erroneous admission of expert testimony].)" (*People v. Prieto* (2003) 30 Cal.4th 226, 247.)  We also review a trial court's determinations under section 352 under the *Watson* standard.  (*People v. Gonzales* (2011) 51 Cal.4th 894, 924.)

As noted above, Pincus specifically testified that she knew nothing about the facts of this case or Melissa's relationship with defendant.  Apart from Pincus's testimony, Melissa gave detailed testimony at the preliminary hearing about defendant's January 9, 2011, attack.  Many of the details of that attack—that defendant punched Melissa in the eye, that he hit her in the head with a hammer, and that he choked her—were corroborated by the emergency room doctor's testimony about the physical injuries Melissa suffered.  Moreover, the trial court instructed the jury with CALCRIM No. 850 that Pincus's testimony was not evidence that defendant committed any of the charged offenses, and that it could consider her testimony only in deciding if Melissa's conduct was consistent with someone who had been abused and in evaluating the believability of Melissa's testimony.  The trial court's limiting instruction cured any potential prejudice to defendant.  (*People v. Homick* (2012) 55 Cal.4th 816, 867 [jurors are presumed to understand and follow limiting instructions].)  Accordingly, any error was harmless.  (*People v. Prieto, supra,* 30 Cal.4th at p. 247; *People v. Gonzales, supra,* 51 Cal.4th at p. 924.)

## II.     Melissa's Absence From The Trial

Defendant next contends that Pincus's testimony left the improper impression with the jury that Melissa did not testify at trial due to battered woman's syndrome.  Although unclear, it appears that defendant contends that the trial court's instruction to the jury that defendant was not responsible for Melissa's unavailability was inadequate.  Defendant

has forfeited this contention. Even if defendant did not forfeit the contention, the instruction was proper.

## A. Background

Prior to trial, the trial court appointed counsel for Melissa because she was potentially guilty of contempt for having violated the trial court's order that there was to be no contact between defendant and Melissa. The prosecution was unwilling to grant Melissa immunity so she could testify in defendant's trial without possibly incriminating herself, so she stated her intention to exercise her Fifth Amendment right not to testify.

Later, the trial court and counsel for the parties had the following discussion:

"[Trial court]: I think the jurors should also be told that [Melissa's] lack of availability has nothing to do with any conduct by the defendant. Because what I don't want is the jury to think, well, the reason she's not here is because he did something to her which prevents her from being here. [¶] Do agree with that?

"[Defense counsel]: I do.

"[Trial court]: Do you have any problem with that?

"[Prosecutor]: No."

At the point in defendant's trial that the prosecutor intended to call Melissa, the trial court asked Melissa if she had changed her mind and would testify. Melissa responded that she would exercise her Fifth Amendment right and not testify. The trial court declared Melissa to be an unavailable witness within the meaning of Evidence Code section 240 and ruled that her preliminary hearing testimony could be read to the jury. Just before Melissa's preliminary hearing testimony was read to the jury, the trial court instructed the jury, "Folks, this would be the point in time when the complaining witness, Melissa Renteria, would be testifying. Melissa Renteria is not available to testify during this trial. Her lack of availability is not due to any conduct by this defendant."

At trial, Pincus testified that an abuse victim whose "trauma window" has closed and who has returned to her abuser will do what her abuser tells her to do to interfere

13

with the court process or otherwise help the abuser. One of the ways an abuser will tell his victim to interfere with the court process is to disappear.

### B. Forfeiture

A defendant who does not object to an instruction, but instead agrees that the trial court may so instruct the jury forfeits any claim that the trial court erred in instructing the jury. (*People v. Bolin* (1998) 18 Cal.4th 297, 326 [forfeiture found where defense counsel did not object to an instruction and agreed that it be given].) When the trial court proposed that the jury should be instructed that defendant was not responsible for Melissa's unavailability, defense counsel agreed. When the trial court ultimately instructed the jury consistent with its proposed instruction, defense counsel did not object. Accordingly, defendant forfeited review of this issue. (*Ibid.*)

### C. Merits

Even if defendant had not forfeited review of this issue, his apparent contention on appeal is without merit. The trial court specifically and unambiguously instructed the jury that Melissa's unavailability at trial was "not due to any conduct by this defendant." We presume jurors understand and follow a trial court's instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.) No reasonable juror could have misunderstood the trial court instruction as permitting him or her to decide that defendant was responsible for Melissa's unavailability based on Pincus's testimony that abuse victims interfere, at the request of their abusers, with the court process by disappearing. (*People v. Coddington* (2000) 23 Cal.4th 529, 594 ["We credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions. [Citations.]"], overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

### III.    Melissa's Truthfulness

With respect to an abuse victim's conduct after her "trauma window" opens, Pincus testified, "At that moment, that victim is going to spontaneously spit out what happened to them out of the fear of what has just happened to them.  They have enormous need to tell people what just happened to them.  They don't edit it."  The clear import of Pincus's testimony, defendant contends, is that at a certain time during the "cycle of violence" the claims of an alleged abuse victim are unedited and likely to be true.  Testimony of that nature, defendant argues, violates the rule in *People v. Johnson* (1993) 19 Cal.App.4th 778 that an expert may not testify about the truthfulness of a class of witnesses.  (*Id.* at p. 786 ["Evidence of a generalized tendency of some groups of witnesses to lie, unrelated to the credibility of the specific witnesses in issue, is irrelevant and not the subject of legitimate scientific evidence from expert witnesses"].)  Defendant has forfeited review of this contention, the contention fails, and any error was harmless.

"The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful.  (Evid. Code, § 801, subd. (a); see *People v. Cole* (1956) 47 Cal.2d 99, 103 [301 P.2d 854].)"  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82 [opinion of expert witness in support of a capital defendant's battered woman's syndrome defense was improper as it concerned the defendant's truthfulness which was a matter for the jury].)  Notwithstanding that general rule, a defendant must make a timely and specific objection or a motion to strike to preserve for appeal a claim that an expert witness improperly opined on a witness's truthfulness.  (*Id.* at pp. 81-82, citing Evid. Code, § 353, subd. (a) & *People v. Holt, supra,* 15 Cal.4th at p. 666; see also *People v. Valdez* (1997) 58 Cal.App.4th 494, 505.)

First, defendant's contention fails because he did not object to the challenged testimony on the ground asserted on appeal, or at all.  Because defendant did not object to Pincus's testimony on the ground that Pincus had improperly offered expert opinion

testimony about a witness's truthfulness, he has forfeited review of this claim. (Evid. Code, § 353, subd. (a); *People v. Coffman and Marlow, supra,* 34 Cal.4th at pp. 81-82; *People v. Holt, supra,* 15 Cal.4th at p. 666; *People v. Valdez, supra,* 58 Cal.App.4th at p. 505.)

Second, defendant's claim fails on the merits. Defendant contends that Pincus testified that, at certain times, abuse victims are "inherently truthful." Pincus's testimony is not reasonably susceptible of that interpretation. Pincus's testimony concerned the point in the cycle of abuse that some victims reach when they are able to report their abusers and the abuse. Although Pincus testified that such victims report the abuse they have suffered without "edit," she said nothing about the veracity of such reports.

Finally, for the reasons stated above, any error in admitting Pincus's testimony was harmless. (*Watson, supra,* 46 Cal.2d at p. 836.)

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

MOSK, J.

We concur:

TURNER, P. J.

KRIEGLER, J.

16