Filed 10/21/14  P. v. Martinez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VICTOR MARTINEZ,<br><br>    Defendant and Appellant. | H039511<br>(Santa Clara County<br> Super. Ct. No. C1241983) |

Defendant Victor Martinez appeals from a judgment following his conviction of crimes charged following a police officer's investigation of a stolen automobile.  We will affirm the judgment in part and reverse it in part.

## PROCEDURAL BACKGROUND

A jury convicted defendant of receiving a stolen motor vehicle (Pen. Code, § 496d; count 1)),[1] possession of ammunition by a prohibited person (§ 30305, subd. (a)(1); count 2), and possession of burglary tools (§ 466; count 3).  For each count, it found true a sentencing-enhancement allegation that he committed the offense for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)).

---

[1] All unlabeled statutory references are to the Penal Code.

After defendant waived his right to a jury trial on four sentencing-enhancement allegations of serving prior prison terms (§ 667.5, subd. (b)), they were tried to the court, which found three of them true and one not.

The trial court sentenced defendant to 10 years 4 months in state prison. In so doing, it imposed a two-year sentence on the stolen-vehicle conviction (count 1) and eight-month consecutive sentences on the ammunition (count 2) and burglary-tools (count 3) convictions. On the jury's gang-benefit true findings, it imposed a three-year sentence enhancement on count 1, a one-year sentence enhancement on count 2, and no punishment on count 3. Finally, it imposed the one-year sentencing enhancements applicable to the three prior-prison-term true findings.

## FACTS

The jury received the following evidence regarding the circumstances of the charged crimes:

Shortly before midnight on September 27, 2012, San Jose Police Department Officer Kevin McClure heard a revving engine and squealing tires. He saw a Honda automobile turn toward his patrol car and then away from it into an alley. He followed it and discovered it parked, with two individuals running away from it. He apprehended defendant, who, when he first spotted him, was some 15 feet from the driver's side of the car.

An expert witness on criminal street gangs, Santa Clara County District Attorney's Office Investigator Michael Whittington, testified that the area surrounding the intersection near which the officer apprehended defendant is a "stronghold" for the Sur Santos Pride subdivision of the Sureño criminal street gang.

A key fell from defendant. Officer McClure described it as a shaved key—one modified in order to open car doors and turn on ignition systems. He arrested defendant for possessing a burglary tool. In searching him, he found another modified key and a factory vehicle key in a pocket.

2

Defendant spoke voluntarily and denied having been in the Honda, which turned out to have been reported stolen.

The officer found the car doors unlocked and no key in the ignition switch. He tried to start the vehicle with the modified keys but neither worked. He did not notice anything amiss with the ignition switch, door locks, or windows.

The officer located a backpack on the floor behind the driver's seat. Although there was no testimony on this point, the record shows that the backpack contained a card with a fleur-de-lis image. We will have more to say about the state of the record *post*, pages 8-10.

The backpack contained other paper items, some or all of them bearing defendant's name; a pair of jeans; a handmade birthday card addressed to defendant; toiletries; and a telephone charger for use in a vehicle.

On the front passenger's seat, the officer found an iPod electronic-media player device plugged into a cigarette lighter. The iPod bore a fleur-de-lis screen image.

The officer found a trunk organizer next to the backpack. Inside, he found three boxes of ammunition—two of nine-millimeter rounds and one of .22-caliber rounds.

The owner of the stolen car testified that he did not own any of the items the officer found inside it. Latent fingerprints recovered from the ammunition boxes were not identifiable. The prosecutor, during his rebuttal argument, acknowledged that there was no useful fingerprint evidence in the case.

The jury also heard evidence of defendant's involvement in the Sureño criminal street gang.

When Officer McClure arrested defendant, he saw several tattoos on him. One was the word "SUR" on the back of his head; another consisted of a series of three dots on his left wrist. Other testimony would later establish that the three-dot motif identifies the wearer as a Sureño.

Whittington, the criminal investigator, testified as an expert on the Sureño gang and its subdivisions. The Sur Santos Pride Sureño street gang subset uses the fleur-de-lis, and specifically the design of that French symbol employed by the New Orleans Saints professional football team, as a membership emblem. Santos, as in defendant's gang subdivision Sur Santos Pride, means Saint, as in the New Orleans Saints, and so Sur Santos Pride is "known by the fleur-de-lis and the Sur and the 13," the expert explained. "[I]t's not uncommon to see [Sur Santos Pride] members with fleur-de-lis on phones, . . . jerseys, et cetera."

Whittington testified that the Sureños are controlled by the Mexican Mafia, a criminal prison gang. The Sureño street gang provides operatives for the Mexican Mafia. Defendant was an active Sureño; indeed, in 2011 defendant told police that he was part of the Mexican Mafia. Whittington's opinion about defendant was also based on the evidence in the case, including his tattoos, evidence retrieved from his backpack, including a birthday card signed by various known Sureños, his moniker *Mono* (Spanish for Monkey), and previous documentation the investigator had reviewed. Whittington concluded that defendant "has clout" within the Sureño gang and opined that he committed the charged crimes for the benefit of Sureños.

The other gang expert, California Department of Corrections and Rehabilitation Special Agent Michael Brodie, explained the Mexican Mafia's history. It had 100 to 150 so-called made members, akin to partners in a legal partnership. Their subalterns included "crew bosses" or "associates" who organize the Sureño subsets for criminal purposes. The 100 to 150 Mexican Mafia partners "control and influence" the operations of some 75,000 to 100,000 Sureño street gang members throughout the United States.

Brodie opined that defendant was a Mexican Mafia associate—not a so-called made member but "more of a crew boss," i.e., lower-ranking in the prison gang hierarchy. A crew boss is "a representative out there in [an] area that is going to be running that area for you as a made member." As a crew boss, defendant was nevertheless "somebody of

4

major significance" on the street at the county level. He noted the Aztec shield tattoo on defendant's chest, a blazon that must be earned through diligent work. Like Whittington, Brodie noted defendant's statement to police in 2011 that he was a member "in good standing" (the witness's recollection of the words of the police officer's question on that occasion) of *la Eme*, a Spanish proper noun for the letter em, the thirteenth letter of the alphabet in both Spanish and English. *La Eme* is another term for the Mexican Mafia.

Brodie also testified about defendant's notes sent to other gang members in jails or prisons. They were discovered in another inmate's jail cell in August of 2012. One addressed an ordered killing. They showed that defendant participated in gang business.

DISCUSSION

### I. Sufficiency of Evidence of Stolen Vehicle Conviction

Defendant claims that his conviction of violating section 496d was based on insufficient evidence, thereby violating his rights to due process of law under the Fourteenth Amendment to the United States Constitution. He reasons that though property connected to him, i.e., the backpack, was found in the car, there was insufficient evidence that he knew the car had been stolen or that he exercised dominion or control over the stolen car.

If we were "assessing such a claim [under state law], we [would] review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] 'The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the

5

essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.)' " (*People v. Watkins* (2012) 55 Cal.4th 999, 1019-1020.)

Subdivision (a) of section 496d provides, in pertinent part: "Every person who . . . receives any motor vehicle . . . that has been stolen . . . , knowing the property to be stolen[,] . . . shall be punished. . . ."

Thus, to sustain a conviction for possessing a stolen vehicle, the prosecution must prove that (1) the vehicle was stolen; (2) the defendant knew it was stolen; and (3) the defendant had possession of the stolen vehicle. (*People v. Martin* (1973) 9 Cal.3d 687, 695.)

Possession of stolen property may be actual or constructive, sole or joint. It suffices that the defendant have a measure of control or dominion over the stolen property. (*People v. Land* (1994) 30 Cal.App.4th 220, 223-224.) But mere proximity to stolen property, e.g., as a car passenger, does not permit a conviction for receiving stolen property (*People v. Myles* (1975) 50 Cal.App.3d 423, 429), if that is all the evidence there is. In *Myles*, evidence that the defendant was a passenger in a car and was found looking inside its trunk, which contained stolen property, did not suffice to sustain a conviction for receiving the property. (*Id.* at pp. 426, 429.) *People v. Martin*, *supra*, 9 Cal.3d 687, held that evidence that the defendant received a stolen item by placing it in the trunk of his car was insufficient to sustain a conviction for also receiving stolen property that remained in a codefendant's car. (*Id.* at p. 696.) The defendant may have known the other property was stolen, but even so, he never possessed it, because his mere presence at the scene did not constitute possessing it. (*Ibid.*)

Before discussing the question of possession, we must dispose of defendant's arguments regarding the first two elements of the offense. Defendant concedes, as he must, that there was sufficient evidence that the car was stolen. He disputes that there was sufficient evidence to establish he knew it was stolen, but that is not the case. He was running away from a car that had been stolen. A rational trier of fact "could

6

reasonably infer appellant fled because he knew he was driving a vehicle he had just stolen . . . ." (*People v. Young* (1992) 11 Cal.App.4th 1299, 1307; see *People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1577 ["A rational trier of fact could have inferred that appellant knew the truck was stolen . . . , based upon the circumstances of his flight"]; *State v. Serrano* (1969) 53 N.J. 356, 360 [251 A.2d 97, 99], cited in *People v. Land*, *supra*, 30 Cal.App.4th at p. 226, fn. 3 [passenger's fleeing "from the scene where [the police] had caused [the driver] to stop the car might justify an inference that he knew or suspected the car was stolen"].) Defendant himself argues that nothing in the car was incriminating per se: there were personal items belonging to him, but they were innocuous legal and commercially available items, such as items bearing the fleur-de-lis motif of the New Orleans Saints football team. There was also ammunition, but defendant argues that nothing connects it to him. (We will discuss this contention in our consideration of defendant's next claim.)

Even without these circumstances, a rational trier of fact could conclude that a person who flees from a stolen car knows it is stolen, and with these circumstances—that under defendant's own reasoning nothing but the car itself suggested an obvious reason for flight—that conclusion is reinforced.

We note that in *People v. Clark* (1967) 251 Cal.App.2d 868 (*Clark*), a case considering accomplice liability for theft of a vehicle, the court held that "a conviction cannot be based on a vacuum; there must be affirmative evidence for the prosecution to show guilt" (*id*. at p. 874) and that there was insufficient evidence to confer accomplice liability on a passenger who ran away on foot from police who stopped the car. The passenger testified he did not realize the car was stolen until well into a trip the driver was taking and "explained his running away as 'panic' and that he was 'afraid of the police.' " (*Ibid*.)

In *Clark*, *supra*, 251 Cal.App.2d 868, unlike here, the only evidence was that the defendant was not the driver—here it is unclear what role defendant played in the

operation of the vehicle—and the court was concerned with an aspect of accomplice liability, specifically its conclusion that guilt could be not be found unless "defendant must have known that the vehicle had been unlawfully acquired and must have had that knowledge at a time when he could be said to have, in some way, aided or assisted in the driving." (*Id.* at p. 874.) The *Clark* court acknowledged, however, that the defendant's "running away may have been caused by his knowledge of his individual guilt." (*Ibid.*)

*Clark*, *supra*, 251 Cal.App.2d 868, predates more modern authority, including the landmark 1979 case of *Jackson v. Virginia*, *supra*, 443 U.S. 307, on which the due process claim of defendant here ultimately rests, and *Clark*'s facts and legal considerations are different. We need not address *Clark*'s continuing vitality, but it is sufficiently divorced from the facts and law before us that we need not concern ourselves with it further.

We return to defendant's weightier contention: that the presence of his backpack in the vehicle did not constitute constitutionally sufficient evidence that he—and not another person who could have stolen the car and been its driver—had sole possession of the car.

To be sure, and to state the obvious, "Had appellant been the driver[,] presumably there would have been no question he had possession of the car." (*People v. Land*, *supra*, 30 Cal.App.4th at p. 223, fn. 2.) Here, by contrast, the officer could not perceive who had been driving the car; defendant could have been the passenger and had no control over it. We must look to other evidence to determine if there was sufficient evidence that defendant had control of some part of the car and thus satisfied the possession element of the offense.

There was such evidence. There was testimony that plugged into the car's cigarette lighter was an iPod with the fleur-de-lis motif as its wallpaper. Whoever inserted the iPod controlled the car to that extent. The jury could rationally conclude that the iPod was inserted by defendant. It saw that his backpack contained an item that also

8

had the fleur-de-lis motif. The manner in which we ascertain this circumstance is unorthodox but satisfactory. No witness testified before the jury that he or she was holding an item from defendant's backpack that displayed a fleur-de-lis. But we have no doubt that the jury saw such an item, because, in the jury's presence, Officer McClure opened the backpack and examined its contents item by item, including Exhibit 14, which was marked for identification. The court reporter's exhibit list, recited in the reporter's transcript, states that Exhibit 14 is a "New Orleans Saints emblem," i.e., a fleur-de-lis. Defense counsel mentioned at closing argument that a fleur-de-lis emblem was found both in the backpack and on the iPod's wallpaper, but argued they could have belonged to any Sureño. During the prosecutor's rebuttal argument, he too mentioned the presence of these items. The prosecutor stated that defense counsel argued "that the fleur-de-lis found on the iPod suggests that the defendant wasn't in the car. Well, the fleur-de-lis was also found in his backpack. And the fleur-de-lis is a symbol of SSP [Sur Santos Pride, the Sureño gang subdivision,] as you know from Investigator Whittington's testimony. . . . He associates with SSP people . . . . And the fact that he has an SSP symbol [the fleur-de-lis] in his backpack along with the [birthday] card from lots of other hoods in his backpack with his personal information . . . suggests . . . that the iPod with the fleur-de-lis puts him in the car as well."

What is missing from the record is a question by the prosecutor asking the witness to show and describe Exhibit 14 to the jury. Nevertheless, the state of the record satisfies us that the jury saw the item. With a fleur-de-lis being found both among defendant's possessions and on the wallpaper of the iPod inserted into the car's cigarette lighter, a rational trier of fact could conclude that defendant owned both items and controlled the car to the extent he was able to avail himself of the car's cigarette lighter to charge the iPod device. Although minimal, that degree of control satisfies the rule that if an actor acquires some measure of dominion over or control of the vehicle, the actor possesses the

9

vehicle for purposes of section 496d. There was no violation of defendant's Fourteenth Amendment due process rights.

## II. *Sufficiency of Evidence of Ammunition Conviction*

Defendant claims that for purposes of his Fourteenth Amendment due process rights the evidence was insufficient to establish his possession of the ammunition found within the vehicle. We agree and will reverse the judgment insofar as it embraces defendant's conviction of possessing ammunition and the gang-benefit true finding that pertains to this conviction.

Defendant contends "there is no evidence establishing [his] exercise of dominion or control over the ammunition" and therefore his "conviction for ammunition possession cannot stand." He is correct. No fingerprint evidence was found on the ammunition. There was no evidence that defendant was the driver of the car. From all that appears in the record, defendant may have been a passenger in a car in which the driver, unbeknownst to defendant, had placed ammunition boxes behind the front seats. Unlike the iPod, for which there was corroborating evidence that defendant owned the device, in the form of an item in his backpack bearing the same fleur-de-lis motif as did the iPod, there is no corroborating evidence that might point to defendant as the possessor of the ammunition.

The People argue that the ammunition was found close to defendant's backpack and could be seen by someone looking behind the front seats. In other words, they rely on a contention similar to the People's view in *People v. Zyduck* (1969) 270 Cal.App.2d 334, 335 (*Zyduck*), in which the People argued that the "defendant's mere presence in a car owned and driven by another, in which the stolen property is readily visible, is enough to show possession." Just as the People's contention in *Zyduck* failed to persuade the reviewing court (*id*. at p. 335), neither possibility advanced here—proximity of one item to another associated with defendant and visibility—suffices to sustain the conviction.

10

To be sure, in *Zyduck* there was evidence that someone else was driving the car; here there was no evidence about who the driver was. But, for due process purposes, what counts is that there was no sufficient evidence here that defendant was the driver. Running away from the car was not solid evidence that defendant was the driver; a Sureño gang member with a criminal record would likely run from any car that he knew to be stolen, as it appears defendant did. A person does not possess an item merely by seeing it or being near it. "Mere access or proximity to stolen goods is not enough to infer possession . . . ." (*People v. Martin*, *supra*, 9 Cal.3d at p. 696.) Nor, absent circumstances for which no evidence was presented here, do objects become associated with a person merely because they are near other objects that are so associated.

The People also remind us of the expert testimony that possessing guns and ammunition benefits criminal street gangs. But that does not constitute evidence that defendant possessed the ammunition, only that if he did, it would benefit the Sureños. We cannot bootstrap the latter evidence to turn it into evidence that if the ammunition was behind defendant in the car, he therefore must have possessed it.

In sum, "Opportunity of access to a place where contraband is stored is not enough, by itself, to establish possession. [Citation.] Dominion and control are essentials of possession, and they cannot be inferred from mere presence or access. Something more must be shown to support inferring of these elements. Of course, the necessary additional circumstances may, in some fact contexts, be rather slight. [Citations.] It is clear, however, that some additional fact is essential. We find none here." (*Zyduck*, *supra*, 270 Cal.App.2d at p. 336.)

The judgment will be reversed with regard to defendant's conviction of unlawfully being in possession of ammunition and the gang-benefit true finding that pertains to this conviction.

11

### III.  *Denying Motion to Bifurcate Trial of Gang-benefit Allegations*

Defendant claims the trial court infringed on his right to due process of law under the Fourteenth Amendment to the United States Constitution by denying his motion to bifurcate the trial on the gang-benefit sentencing-enhancement allegations.

Although defendant raises a federal constitutional claim on appeal, trial counsel did not do so in the court below.  " 'In those instances where he did not present constitutional theories below, it appears that either (1) the appellate claim is one that required no objection to preserve it, or (2) the new arguments are based on factual or legal standards no different from those the trial court was asked to apply, but raise the additional legal consequence of violating the Constitution.  "To that extent, defendant's new constitutional arguments are not forfeited on appeal." [Citation.]  [But no] separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or "gloss" raised for the first time here.' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 958.)  This is a claim of the second type.  We will therefore address the state-law underpinnings of defendant's claim and resolve it according to them.

We review a claim of this type for abuse of discretion.  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1044, 1048 (*Hernandez*).)  The burden is on the defendant to show there is a substantial danger of undue prejudice from the evidence.  (*Id*. at pp. 1050-1051.)

*Hernandez* recognized that there will generally be less need for bifurcation of a gang enhancement than a prior conviction allegation.  "[T]he criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense." (*Hernandez*, *supra*, 33 Cal.4th at p. 1048.)  "[E]vidence of gang membership is often relevant to, and admissible regarding, the charged offense.  Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the

12

like—can help prove identity, motive, modus operandi, . . . intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary." (*Id*. at pp. 1049-1050.)

Other considerations, however, militate in favor of bifurcation. "The predicate offenses offered to establish a 'pattern of criminal gang activity' (§ 186.22, subd. (e)) need not be related to the crime, or even the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation. Moreover, some of the other gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Hernandez*, *supra*, 33 Cal.4th at p. 1049.) Defendant argues that these considerations apply to him.

To be sure, none of the charged crimes was intrinsically gang-related; they were of the type that any malefactor could commit, gang associate or not. But defendant's theory of events included a denial of any connection to the contraband vehicle. Officer McClure testified that defendant told him, before the officer discovered defendant's belongings, "that he hadn't been in that vehicle." Defense counsel pursued that theory at closing argument, arguing repeatedly that the prosecution had not met its burden to establish beyond a reasonable doubt that defendant had been in the car.

To address the problem of defendant's backpack being found inside the car, defense counsel proposed that the car driver was bringing it to defendant, who was waiting for it on the street; the driver saw the police car and panicked, thereby causing defendant to panic; and their joint panic led to defendant's running away from the car, although he had not been in it and had no connection to it. Defendant, his counsel argued, was "not necessarily in the same vehicle at the same time as paperwork bearing his name."

13

Thus, according to defendant's theory of the case, the evidence found inside the car and his flight from the car's vicinity were not enough to prove intent and motive to commit the receiving-stolen-property count involving the car. This left it to the prosecution to try to convince the jury that defendant had some illicit and gainful purpose under section 496d, i.e., that he was not merely joyriding in a car even if he knew to be stolen, was unaware the car was stolen, or had no relationship to the car at all, as he told Officer McClure and his counsel kept asserting during argument. The prosecution probably surmised from the outset of the case that defendant would not fool any trier of fact into accepting that he had not been in the car, but it must have been aware of a possibility that defendant would then fall back to a predictable next line of defense: he could still argue that the prosecution had provided evidence only of his mere presence in the car, possibly as a passenger. That quantum of evidence would not be enough evidence to convict him of possessing a stolen vehicle, a scenario the prosecution was entitled to believe in light of the altered car keys, the Sureño "stronghold" location at which events had unfolded, and defendant's long-standing Sureño ties. In the prosecution's theory of the case, Officer McClure had interrupted a gang-benefitting operation. Evidence of defendant's gang affiliations was thus, as far as the prosecution could legitimately believe, "important to the motive" (*People v. Martin* (2000) 23 Cal.App.4th 76, 81) of defendant; i.e., he possessed the car in the midst of Sureño territory to do gang business and increase the gang's fortunes.

### IV. *Overruling Objection to Expert's Testimony that Defendant's Actions Benefitted the Gang*

Over defendant's objection, one of the prosecution's gang-expert witnesses was allowed to testify that defendant committed the three charged crimes to benefit the Sureños. This testimony was directed to the four sentencing-enhancement allegations that he committed the offense for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)). Defendant claims that in allowing this

14

testimony, the trial court "violated appellant's rights to a fair trial, a reliable verdict based on evidence found true beyond a reasonable doubt and due process of law under the Fifth, Sixth and Fourteenth Amendments." Defendant's claim is, however, "in substance, one of erroneous admission of evidence" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 76) under state law (*ibid.*) and we will address it accordingly.

### A. *Background*

Toward the end of the direct examination of Michael Whittington, the investigator who was testifying as an expert in the practices of the Sureño gang, this exchange occurred:

"Q. . . . In your expert opinion did the defendant, Victor Martinez, commit each of these crimes for the benefit of, at the direction of, or in association with a criminal street gang?

"[Defense Counsel]: Your Honor, I would like to preserve an objection for ultimate conclusion of the jury. [*Sic*.]

"THE COURT: All right. Objection's overruled.

"[Defense Counsel]: Thank you.

"THE WITNESS: I believe that the crimes listed Mr. Martinez did for the benefit of the criminal street gang known as Sureños. [*Sic*.]

"Q. BY [The Prosecutor]: For the benefit of the Sureños?

"A. Correct.

"Q. Okay. And can you tell us why you think that for each crime?

"A. . . . In this case, Mr. Martinez is in a documented gang area, in a stolen vehicle with ammunition on a day where other Sureños were found in stolen vehicles in a time where stolen vehicles have become an increasing trend to make money documented through San Jose Police reports as well as through my contacts with gang members, I believe in my expert opinion that this crime was done to benefit Sureños. [*Sic*.]

"Q. And what would be the benefit to the Sureños?

15

"A. It would be the ability to make money, . . . to transport Sureños . . . without being traced by law enforcement if they're stopped . . . ."

The witness proceeded to explicate his views regarding each specific charged crime and how it benefitted the Sureños. In discussing the ammunition possession charge, he opined, "ammunition that is being transported in a stolen vehicle within a known Sureño location[,] to me on my reading of this case and my knowledge of Sureños in San Jose[,] has only one purpose, this ammunition is not being lawfully possessed to go to a range or . . . for sporting purposes. Ammunition [of the type found in the stolen car] has been one of the most popular ammunitions used in shootings."

The next morning, defense counsel cross-examined the witness:

"Q. [The Prosecutor] was just asking you about if in your opinion Mr. Martinez committed the charged offense here for the benefit of, in association with, or at the direction of a criminal street gang?

"A. He asked if it was for the benefit of, yes. [*Sic*.]

[¶] . . . [¶]

"Q. And you told the jury your opinion yesterday and today, [and] in reaching that final opinion you are also concluding that Mr. Martinez committed and is guilty of the charged offenses themselves; is that correct?

"A. Could you please repeat the question[?]

"Q. . . . So it's your opinion that Mr. Martinez committed the charged offense of receiving or possessing a stolen vehicle for the benefit of, at the direction of, or in association with a criminal street gang; right?

"A. I am not allowed to determine his guilt[;] that is for the jury to decide, but I may render my opinion based on the factors of the case, based on my reading of this case.

"Q. . . . [Y]ou're taking the premise that Mr. Martinez committed that offense in order to opine that he committed that offense in association with, at the direction of or for the benefit of a criminal street gang; is that fair to say?

16

"A. I believe that's very limited, but it has yes and nos to that. I cannot convict him of his guilt, but when I read the facts of the case and I look at evidence and the probable cause that led to the arrest, I can opine from that probable cause to rest my opinion as to why that criminal activity was conducted. So if that answers your question, I know it's a very vague response but I'm attempting to give you the most accurate response possible."

### B.    *Legal Considerations*

The trial court erred in allowing the prosecutor to ask his question. The more difficult question is whether the error was harmless.

Our Supreme Court has considered the permissible bounds of expert opinion testimony regarding whether an act benefitted a criminal street gang. In *People v. Vang* (2012) 52 Cal.4th 1038 (*Vang*), the court held that a prosecutor may use a hypothetical question to inquire of a gang-expert witness whether it did. The hypothetical question should not try to disguise its factual underpinnings but rather should elucidate them in terms that hew closely to the evidence before the jury. Otherwise, the question would have little obvious bearing on the evidence and not help the jurors decide the question; indeed, it would be irrelevant. (*Id*. at p. 1046.)

In so deciding, however, *Vang* drew a bright line: the gang expert may not testify "that the particular defendants committed a crime for a gang purpose." (*Vang*, *supra*, 52 Cal.4th at p. 1049.) *Vang* endorsed the statement of the trial court in that case to the jury that " 'the law doesn't allow the expert to come in and say exactly what somebody else's mind—what was in their mind.' " (*Ibid.*)

The reason for this, *Vang* explained, is that "expert testimony regarding the defendant's guilt in general is improper. 'A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather, opinions on guilt or innocence are inadmissible because they are of

17

no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." ' " (*Vang*, *supra*, 52 Cal.4th at p. 1048.) So, although "expert testimony regarding whether a crime was gang related is admissible" (*id*. at p. 1049, fn. 5), the expert cannot express a view on whether a defendant is guilty (or, in this case, whether the gang-benefit sentencing-enhancement allegations against defendant were true). Indeed, opinions about the truth of such an allegation are not only unhelpful, as explained in *Vang*, but also, as defendant's claim involves, excessively influential on the jury. Our Supreme Court explained in *People v. Prince* (2007) 40 Cal.4th 1179, that "an expert's opinion that a defendant is guilty is both unhelpful to the jury—which is equally equipped to reach that conclusion—and too helpful, in that the testimony may give the jury the impression that the issue has been decided and need not be the subject of deliberation." (*Id*. at p. 1227.)

It may be argued that Whittington did not express an opinion about the truth (i.e., the equivalent of guilt) of the gang-benefit sentencing-enhancement allegation. One case has held that as long as the witness does not address all of the elements of the charge, a general statement about whether his or her act benefitted a criminal street gang is permissible. "[W]e cannot say the trial court abused its discretion in finding that an expert opinion about whether the participants acted for the benefit of each and every gang . . . would be of assistance to the jury in evaluating the evidence and determining whether the prosecution had proved the enhancement allegation. Such an opinion was not tantamount to an opinion of guilt or, in this case, that the enhancement allegation was true, for there were other elements to the allegation that had to be proved." (*People v. Valdez* (1997) 58 Cal.App.4th 494, 509) (*Valdez*).)

*Valdez* also stated that when an expert is testifying about aspects of gang activity outside what jurors might be expected to be familiar with, it is acceptable to opine on whether a defendant acted to benefit a gang. (*Valdez*, *supra*, 58 Cal.App.4th. at pp. 507-509.) Seven years later, however, *Hernandez*, *supra*, 33 Cal.4th 1040, would observe that

18

"evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, . . . intent, means of applying force or fear, or other [pertinent] issues." (*Id*. at p. 1049.) In such circumstances, an expert witness's opinion on the ultimate issue might be substantially more prejudicial than probative, cumulative, or both. (See Evid. Code, § 352; *People v. Maciel* (2013) 57 Cal.4th 482, 527.)

*Valdez* rested on two considerations. First, the complicated and recondite sociological circumstances the evidence presented warranted the expert testimony the jury heard. "[T]he questions of how such a diverse group, which, in [the expert witness's] opinion, represented seven different . . . gangs, could have been acting for the benefit of a street gang and whether the participants were doing so presented matters far beyond the common experience of the jury and justified expert testimony." (*Valdez, supra,* 58 Cal.App.4th at pp. 508-509.) Under evidence suggesting less complicated circumstances, "then perhaps expert testimony about rivalries, turf, respect, and forms of violence used by gangs might enable a jury to determine the 'for the benefit etc.' element as easily and intelligently as a gang expert could, thereby precluding the need for an expert opinion on that specific issue. However, the facts of the case were not so simple." (*Id*. at p. 508.)

Second, the gang-expert witness's opinion that a defendant acted to benefit a gang "was not tantamount to an opinion of guilt or, in this case, that the enhancement allegation was true" (*Valdez, supra*, 58 Cal.App.4th at p. 509), because "there were other elements to the allegation that had to be proved." (*Ibid.*)

This court now has the benefit of our Supreme Court's thinking in *Vang*, *supra*, 52 Cal.4th 1038, and *Hernandez*, *supra*, 33 Cal.4th 1040. In *Vang*, the court took note of *Valdez*'s recondite sociological underpinnings and said, "It appears that in some circumstances, expert testimony regarding the specific defendants might be proper."

19

(*Vang*, *supra*, 52 Cal.4th at p. 1048, fn. 4.)  But it left for another day what circumstances might justify such testimony.  (*Ibid.*)

Here, unlike *Valdez*, the circumstances are not so mysterious as to fall outside the jurors' ability to analyze them for themselves.  The jury already knew that defendant was arrested in a Sureño "stronghold" and that he was a Sureño, and it would have been obvious to any thinking juror—the record contains no evidence that the jurors did not take their duties seriously and carry them out capably—that a criminal street gang would benefit from easy-to-abandon stolen cars, automobile-burglary tools to help obtain such cars, and ammunition, given that criminal street gangs cannot settle disputes in court or before professional arbitrators.  The first consideration present in *Valdez*—complicated sociological considerations underpinning the charged crimes—is not present here.  As for *Valdez*'s second consideration, that case considered testimony about whether a particular defendant committed a crime to benefit a criminal street gang to be at a remove from the question whether he or she was guilty of a crime or whether a gang-benefit allegation was true.  Our Supreme Court, however, appears in *Vang* to have viewed the two matters as closely intertwined, if not identical.

To repeat, *Vang* endorsed the statement of the trial court in that case to the jury that " 'the law doesn't allow the expert to come in and say exactly what somebody else's mind—what was in their mind.' " (*Vang*, *supra*, 52 Cal.4th at p. 1049.)  Certain acts can only be committed with a particular mental state.  For example, fraud involves purpose or knowledge—it is hard to conceive of a negligent or reckless fraud.  By contrast, battery can involve a number of mental states, including recklessness or negligence, quite possibly from recklessly or negligently intoxicating oneself with alcohol or drugs (see *People v. Hood* (1969) 1 Cal.3d 444, 455-459).  In cases involving the gang-benefit allegation of subdivision (b)(1) of section 186.22, testimony that an accused committed a crime for the benefit of a criminal street gang cannot help but impart to the jury the expert's implicit opinion that the accused acted with either purpose or knowledge, and

20

most likely purpose. Those mental states comprise the gravamen of the allegation when its element of gang benefit is at issue before the trier of fact. Indeed, Whittington made clear what was implicit in both the statutory language and the prosecutor's question: that defendant acted with the purpose to benefit the Sureños, and Sur Santos Pride specifically. In discussing the ammunition possession charge, he opined, "ammunition that is being transported in a stolen vehicle within a known Sureño location[,] to me on my reading of this case and my knowledge of Sureños in San Jose[,] has only one *purpose*, this ammunition is not being lawfully possessed to go to a range or . . . for sporting purposes." (Italics added.) The concurrence in *Vang* noted that the same consideration applies to motive. (See *Vang*, *supra*, 52 Cal.4th at p. 1053 (conc. opn. of Werdegar, J.) ["the expert told the jurors what inference concerning defendant's motive to draw in the event it did find the prosecution's evidence to be true"].) The concurrence said that expert testimony encompassing motive can be acceptable, but only if without it the jurors would be unable assess motive for themselves. "[W]hether expert opinion on motive is admissible turns on whether it will be helpful to the jurors without unnecessarily supplanting them." (*Id*. at p. 1054.)

Even if the underlying gang activities are likely to be difficult for a jury to comprehend, *Vang* seems to instruct that the bright-line rule is operative except possibly in unusual circumstances like those described in *Valdez*, *supra*, 58 Cal.4th 494. It suffices to say that in this case, unlike *Valdez*, any jury regularly performing its duty— and the record contains no evidence that this jury was not doing so—was as capable as Whittington of assessing whether defendant committed his crimes to benefit the Sureño Sur Santos Pride gang subset. The court erred in allowing the detective's testimony.

The question is whether the error is harmless. Despite defendant's insistence to the contrary, the standard is the *Watson* state-law standard (*People v. Watson* (1956) 46 Cal.2d 818, 836), i.e., no reasonable probability that "the jury would have returned a verdict more favorable to defendant had it heard the expert witness's explanation of gang

21

culture and practices, as it did, but not his opinion that the crime was gang motivated, as it also did." (*Vang*, *supra*, 52 Cal.4th at p. 1053 (conc. opn. of Werdegar, J.).)  A claim that a witness "gave inadmissible opinion testimony on the central question of . . . guilt . . . is, in substance, one of erroneous admission of evidence, subject to the standard of review for claims of state law error." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 76; see also *Valdez*, *supra*, 58 Cal.App.4th at p. 511.)

Under the lenient *Watson* standard of review for prejudice, we are constrained to find the error harmless.  Whittington, showing understanding of a fine point in the law, testified on cross-examination that the question of the truth of the enhancement allegations was for the jury.  Perhaps more important, all of the other testimony adduced on local Sureño activities pointed to defendant acting for the gang's benefit when arrested by Officer McClure.  Against this, to be sure, the evidence against defendant pointed to crimes not notably associated with gang activity; as mentioned, unlawfully receiving stolen property and possessing contraband ammunition and burglary tools are easily associated with a malefactor who does not belong to a gang.  Still, under the *Watson* standard for evaluation of prejudice, "we find no reasonable probability exists that absent the error the outcome would have been more favorable to defendant[ ]." (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1421, citing *People v. Watson*, *supra*, 46 Cal.2d 818, 836.)

This is, however, not an entirely satisfactory state of affairs.  "It is the boast of our law that there can be no right without a corresponding remedy." (*State v. Public Service Com'n of Washington* (1917) 94 Wash. 274, 287 [162 P. 523, 528].)  Thus, "every right must have a remedy.  [Citation.]  '[A] right but no expeditious and adequate remedy . . . . is an unconscionable situation which a court of justice cannot tolerate.' " (*People v. Pickelsimer* (2010) 48 Cal.4th 330, 339.)  The right infringed on here has, for all practical purposes, no remedy beyond a remonstration to a trial court or a prosecutor, a situation that offers cold comfort indeed to the person whose right was violated.  That makes the right at best evanescent.  Unless a prosecution gang-expert witness's only testimony is a

22

declaration that an accused committed charged crimes for gang purposes, or unless the witness provides other testimony but then lectures the jury that its duty is to find guilt or a true allegation, what amounts to an opinion about the defendant's guilt or the truth of the allegation is likely always to be found harmless under *Watson*. Situations like this one are thus "troubling." (*Lane v. First Nat. Bank of Boston* (1st Cir. 1989) 871 F.2d 166, 173.) Like the court in *Lane*, "We are not unmindful of the seeming inequities of this result . . . ." (*Ibid.*)

Sir Robert Bolt's play A Man for All Seasons recognized this evil of verdicts pushed by the state. After the jury at Sir Thomas More's treason trial had heard the perjured prosecution testimony of Sir Richard Rich, Attorney-General for Wales, the prosecutor proposed that the state's case was so strong that the jury need not retire to deliberate:

"CROMWELL  The case rests!  . . .

"NORFOLK  The jury will retire and consider the evidence.

"CROMWELL  Considering the evidence[,] it shouldn't be necessary for them to retire. (*Standing over* FOREMAN)  Is it necessary?

"FOREMAN  (*Shakes his head*)  No, sir!

"NORFOLK  Then is the prisoner guilty or not guilty?

"FOREMAN  Guilty, my lord!"  (Bolt, A Man for All Seasons (Vintage Books ed. 1962) p. 92.)

We do not wish to extend the analogy too far. A witness has some authority, the prosecutor still more, and the court still more. A verdict urged by a witness would probably have a lesser effect than one improperly urged by the prosecutor through vouching for the state's case (see, e.g., *People v. Redd* (2010) 48 Cal.4th 691, 740), and certainly less than one ordered by the court. Still, Whittington invoked a measure of authority, testifying, "I believe *in my expert opinion* that *this crime* was done to benefit Sureños." (Italics added.)  The lack of an effective remedy for the effects of such

23

testimony, which we believe to be improper under *Vang*, *supra*, 52 Cal.4th 1038, is disquieting.

Nevertheless, we are bound by the rule that the *Watson* standard of harmless error applies. Defendant's claim thus fails. His constitutional claims are unavailing for more pedestrian reasons. Although he raises them on appeal, trial counsel did not do so in the court below. Thus, for reasons stated *ante*, page 12, they are without merit.

## DISPOSITION

The judgment is reversed to the extent it embraces defendant's conviction for unlawfully possessing ammunition and the gang-benefit true finding that pertains to that conviction. The judgment is affirmed in all other respects.

_____
RUSHING, P.J.


WE CONCUR:



_____
PREMO, J.



_____
ELIA, J.

24