Filed 5/17/16  P. v. Rodriguez CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SALVADOR RODRIGUEZ,<br><br>    Defendant and Appellant. | B260777<br><br>(Los Angeles County<br>Super. Ct. No. LA074989) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Joseph A. Brandolino, Judge.  Affirmed.

Cynthia L. Barnes, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted appellant Salvador Rodriguez of willful, deliberate and premeditated attempted murder. (Pen. Code., §§ 664, 187, subd. (a).)[1] The jury also found true the firearm enhancements. (§ 12022.53, subds. (b), (c), (d).) Appellant was sentenced to 32 years to life in state prison as follows: a term of seven years to life for the attempted murder conviction, plus 25 years to life for the finding of personally and intentionally discharging a firearm causing great bodily injury. Appellant contends (1) the evidence was insufficient to support his attempted murder conviction, and (2) the trial court prejudicially erred by admitting irrelevant and excessive gang evidence. We affirm.

## FACTS

**Prosecution Evidence**

### *The Shooting*

On May 11, 2013, Gerardo Martinez, Jr. (Martinez) lived on Wisner Avenue in Los Angeles County with his parents and others. At approximately 11:00 p.m., Martinez was in his room when his cousin told him that appellant and Wallace Bates (Bates) were outside looking for him. Appellant, Bates and Martinez were neighbors. Martinez knew appellant through appellant's brother, Jimmy. Martinez knew appellant as "Chito."

Martinez walked out to the gate, where Bates was waiting. Bates pointed toward a camper and said, "Oh, you know Chito?" Appellant then stepped out from behind a camper, wearing a "[b]lack hoodie, black pants, all black." Martinez was nervous because it was late and two grown men had come to see him. Martinez's father saw appellant and Bates with his son.

Martinez and appellant started walking up the street. Martinez's father saw them walking together. Appellant asked Martinez, "Who are you?" Martinez told appellant his name, that he had lived there for 11 years, that he went to Van Nuys High School, and that he knew Jimmy. Martinez stopped walking and asked appellant, "So who are you?" Appellant and Martinez were standing side by side. Without saying anything, appellant

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

shot Martinez with a black semiautomatic pistol. Martinez did not know appellant had a gun. As appellant was shooting, he said, "I'm Chito."

Martinez was shot three times. The first shot went through his right arm, above the elbow. The second shot hit him in the back as he was running toward his house. The bullet went through his lung and exited his chest. The third shot went through his left upper arm. Martinez ran inside his house and told his father Chito had shot him. His family called 911. Bates helped Martinez's father while they waited for an ambulance. Martinez passed out and woke up in a hospital, where he remained for 13 days. As a result of the shooting, Martinez has a 14-inch plate in his arm. The bullet that passed through his lung severed two arteries and broke two ribs.

**Events Leading to the Shooting**

Before the shooting, Martinez had noticed an increase in gang graffiti in the neighborhood. There were taggings with "X3" or "13," which stood for the Mexican Mafia. There were also tags of "WPS" or "Wicked Pot Smokers," including a "WPS" on a tree with an arrow pointing toward Martinez's house. Bates testified that Martinez was affiliated with the Barrio Van Nuys gang, also known as "BVN," and that he had seen Martinez tagging BVN.

A month or two prior to the shooting, WPS gang members drove by Martinez's house a couple of times. On the first occasion, a WPS member called "Bad Boy" drove by his house, turned around, stopped in front of his house, and asked, "What's up?" Martinez believed Bad Boy was challenging him. On the second occasion, another WPS member called "Risky" drove by Martinez's house at 8:00 a.m., glaring at Martinez in a threatening manner.

About a week before he was shot, Martinez spoke to Bates about the increase in WPS graffiti. Bates hung out with WPS gang members. The day before the shooting, Martinez went to Bates's house. The day of the shooting, Martinez drove to Bates's house and saw appellant sitting on the porch. Appellant got up and reached into the pocket of the same sweatshirt he wore later that night. Martinez did not stop and drove off.

3

Prior to the shooting, Bates went to Risky's house. Bates testified that appellant and Risky are cousins. Bates told appellant that he had talked with Martinez about WPS. At trial, Bates could not recall whether appellant was in a gang.

**Investigation**

A couple of days after the shooting, Los Angeles Police Department (LAPD) Officer Christine Moselle showed Bates a photographic line-up. Bates circled appellant's picture, initialed it, and wrote "Chito" by the picture. Bates also wrote that he was with Martinez's parents at the time of the shooting and that he did not know who was the shooter. Bates testified that appellant was with Martinez right before the shots were fired.

Officer Moselle also showed Martinez's father a photographic lineup. He did not identify anyone from the lineup, but did identify appellant in court.

**Gang Expert**

LAPD Officer Varjol Vardhayakul was assigned to the Van Nuys division gang enforcement team. He regularly gathered information and intelligence on the various gangs existing in the Van Nuys area, which included WPS, Barrio Van Nuys and Blythe Street. WPS and Blythe Street do not like the Barrio Van Nuys gang. WPS is a small gang consisting of about 12 documented members and does not have a specific territory. Various graffiti or tags from WPS can be seen in Van Nuys and seemed to be more centralized around the houses of documented WPS gang members.

Officer Vardhayakul explained that tagging is extremely important to street gangs. It is a way for the gang's members to mark territory, instill fear and intimidate the community and the gang's enemies. If gang members know someone from another gang is living in their neighborhood, they will go to that person's house and mark it with an arrow to indicate a target lives there. When a tag is either crossed out and replaced with another gang's tag or the other gang's tag is placed next to it, retaliation in the form of violence is likely.

4

**Defense Evidence**

Officer Moselle interviewed Martinez, Bates, and Martinez's father. Martinez denied being a gang member, but he "hung out" with his cousin, who is a BVN member. Martinez also indicated that he knew Bates was associated with WPS in some manner. When Bates and appellant showed up at Martinez's house, Bates told Martinez to "go talk to Chito."

Bates was arrested at the crime scene on an unrelated charge. Bates told Officer Moselle that he had heard Martinez was a BVN gang member known as "Cholo." Bates had seen Cholo's tags but had never actually seen him tagging.

Martinez's father was unable to identify appellant from the photographic lineup, because he could not see the shooter's face in the dark.

## DISCUSSION

### I. Sufficient Evidence Challenge

Appellant contends there was insufficient evidence to support his conviction for premeditated and deliberate attempted murder. He argues "substantial evidence did not show that appellant specifically intended to kill [Martinez] or that such intent was a result of premeditation and deliberation."

#### A. *Standard of Review*

A defendant raising a claim that the evidence was insufficient to support a jury's verdict bears a "massive burden" because this court's "role on appeal is a limited one." (*People v. Akins* (1997) 56 Cal.App.4th 331, 336.) "'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053; *People v. Hoang* (2006) 145 Cal.App.4th 264, 275.) We do not reweigh evidence, reappraise the credibility of witnesses, or resolve conflicts in the evidence, as these functions are

5

reserved for the trier of fact.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  This standard applies whether direct or circumstantial evidence is involved.  (*People v. Thompson* (2010) 49 Cal.4th 79, 113.)  Reversal is not warranted unless it appears "'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'  [Citation.]"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### B.  Applicable Law

In determining whether evidence is sufficient to support a finding that a killing or attempted killing was willful, deliberate, and premeditated, reviewing courts typically consider three types of evidence:  prior planning, motive, and the manner of killing.  (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27 (*Anderson*); *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1223.)  Such evidence need not be present in any particular combination or be accorded a particular weight, nor is the list exhaustive.  (*People v. Pride* (1992) 3 Cal.4th 195, 247.)  Rather, the *Anderson* factors serve as an aid to assess whether the killing or attempted killing was the result of preexisting reflection.  (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

Generally, it must be shown that the killing or attempted killing resulted from a preexisting reflection, rather than an unconsidered and rash impulse.  (*People v. Hughes* (2002) 27 Cal.4th 287, 342.)  "'The process of premeditation and deliberation does not require any extended period of time.  "The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]'" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

### C.  Evidence Presented Here

Applying the *Anderson* factors and reviewing the evidence in the light most favorable to the judgment, there was sufficient evidence to support the jury's finding that the attempted murder was willful, premeditated, and deliberate.

First, appellant's actions prior to the attempted murder demonstrate that he planned to kill.  Appellant went to Martinez's house at 11:00 p.m. while carrying a semiautomatic pistol.  He went there with Bates, who was an acquaintance of Martinez

6

and could get Martinez to leave his house. Appellant was dressed entirely in black clothing and stood behind a camper, which blocked Martinez's view of him. Appellant kept himself hidden until Martinez was already away from the house. Appellant then walked Martinez up the street, away from his house and his family, before shooting him at close range.

Second, there was evidence of motive. Martinez had talked to Bates about the increase in WPS tagging in the neighborhood, and Bates had reported this to appellant. WPS gang members had tagged graffiti next to Martinez's house with an arrow pointing toward his house, marking him as a target. WPS members Risky and Bad Boy had driven by Martinez's house in an intimidating manner. The jury could readily infer that appellant and WPS gang members felt compelled to retaliate against Martinez for speaking out against their tagging.

Third, the manner of the attempted killing demonstrates premeditation. Appellant first shot an unsuspecting Martinez while they were standing next to each other. Appellant then fired two more shots at Martinez while Martinez was running away. Contrary to appellant's suggestion, the number of shots fired indicates this was not an unplanned or impulsive act. (See *People v. Herrera* (1999) 70 Cal.App.4th 1456, 1463–1464.)

A jury could reasonably infer appellant attempted to kill Martinez after weighing the consequences of his actions. We are satisfied that sufficient evidence supports the jury's finding of willful, deliberate and premeditated attempted murder.

## II. Gang Evidence Challenge

Appellant contends the trial court committed prejudicial error by allowing the admission of irrelevant and excessive gang evidence.

### A. *Relevant Proceedings*

Prior to trial, defense counsel objected to the admission of gang evidence on the grounds that it was not relevant and was extremely prejudicial. Defense counsel pointed out there was no gang allegation in the information. The prosecutor argued the gang evidence was relevant to the issues of identity and motive. He argued the shooting was

the result of a confrontation over rival gang graffiti in Martinez's neighborhood.  The trial court overruled the objection, finding the evidence relevant to both identity and motive.  Defense counsel renewed her objection just prior to the testimony of the gang expert, and the court relied on its earlier ruling.

### B.  Applicable Law

Evidence Code section 352 provides that a trial court, in its discretion, may exclude evidence if its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice.  "The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason." (*People v. Valdez* (1997) 58 Cal.App.4th 494, 511.)  "[I]n a gang-related case, gang evidence is admissible if relevant to motive or identity, so long as its probative value is not outweighed by its prejudicial effect." (*People v. Williams* (1997) 16 Cal.4th 153, 193.)  The same is true even when no gang enhancement is alleged.  (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

### C.  Gang Evidence Was Relevant

The gang evidence presented here was highly relevant to the issue of motive.  The evidence explained to the jury that Martinez was shot because he complained to Bates about the tagging being done by the WPS street gang in his neighborhood.  It therefore provided context to why appellant would shoot three times at Martinez without any provocation by Martinez.  While appellant suggests that testimony by the gang expert was excessive or duplicative, none of the lay witnesses explained to the jury the importance of tagging to a gang or that disrespecting a gang's tags would lead to violent retaliation.

The gang evidence was also relevant, though less crucially, to the issue of identity, because neither Martinez nor his father identified appellant as the shooter from the photographic lineup.

In any event, the gang evidence was not unduly prejudicial. For purposes of Evidence Code section 352, "prejudicial" is not synonymous with "damaging" (*People v. Karis* (1988) 46 Cal.3d 612, 638), but refers to an unfair or inflammatory impact (*People v. Branch* (2001) 91 Cal.App.4th 274, 286). As explained in *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369: "Evidence of gang activity and affiliation is admissible where it is relevant to issues of motive and intent [citations], and, while admissible evidence often carries with it a certain amount of prejudice, Evidence Code section 352 is designed for situations in which evidence of little evidentiary impact evokes an emotional bias. [Citation.]" While the gang evidence was damaging, it was not likely to provoke an inflammatory bias, given appellant's shooting of an unsuspecting and unarmed Martinez three times at close range, including twice in the back while Martinez was running away.

Accordingly, the trial court did not abuse its discretion in admitting the gang evidence.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
        ASHMANN-GERST


We concur:


_____, J.
      CHAVEZ


_____, J.
      HOFFSTADT

9